50 P.3d 602 (2002)
146 Wash.2d 699
Wallis D. HUBBARD, Petitioner,
v.
SPOKANE COUNTY, Steve Hasson, Phil Harris, and James Manson, Respondent.
No. 70975-1.
Supreme Court of Washington, En Banc.
July 18, 2002.
*604 William Powell, Spokane, for Petitioner.
Hugh Lackie, Amy Clemmons, Spokane, for Respondent.
Andrea Brenneke, Jeffrey Needle, Seattle, Amicus Curiae on Behalf of Washington Employment Lawyers Assoc.
*603 BRIDGE, J.
Petitioner Wallis Hubbard seeks reversal of a Court of Appeals decision in favor of Respondents Spokane County, County Commissioner Steve Hasson, County Commissioner Phil Harris, and James Manson, director of the Spokane County Building and Planning Department (County) on his claim of wrongful termination. We hold that RCW 42.23.070(1) and the Spokane County Zoning Code provide the necessary public policy to sustain a wrongful discharge action in violation of public policy. We further find that dismissal of the case on summary judgment was inappropriate because questions of material fact remain.

I
Hubbard was employed by the Spokane County Planning Department for 17 years before his position was eliminated in June 1995. He served as director of the department for the last 15 of those years. The planning department administers and enforces the County's land use and zoning ordinances and is subject to state statutes. Until May 1995, the planning department was a separate department in the public works division. Dennis Scott was the director of the public works division and Hubbard's immediate supervisor until May 1995.
On May 26, 1995, Hubbard received a letter from Scott indicating that the building department and the planning department were to be consolidated and that James Manson, director of the building department, would now be Hubbard's immediate supervisor. In his affidavit, Scott testified that he had had no input in the decision to reorganize the two departments, which was made by the county commissioners, and that the letter had been drafted by Manson. Scott and County Commissioners Harris and Hasson subsequently told Hubbard he would still have a job as a planning manager.
Shortly thereafter, Manson held a staff meeting that Hubbard attended. According to Hubbard, Manson stated that "he considered the zoning code to be a `development regulation' that could be changed and modified administratively without going through a public hearing."[1] Hubbard disagreed with Manson's position and later presented Manson with chapter 36.70 RCW and a copy of the 1986 zoning code to support his position that the zoning code had been adopted as a county ordinance and was an "`official control.'"[2] Hubbard asserts that Manson maintained his original position despite this information. Manson subsequently informed Hubbard that there was no longer any need for Hubbard to attend the public works staff meetings.
Steven Horobiowski, who was then in charge of current planning, stated that Manson, at a later staff meeting, had directed the staff to "look at the regulations and bend them if possible to fit the project."[3] Another staff member, John Pederson, stated that Manson told the staff to interpret the code in "ways to help people get where they want to go" and indicated that it was like going over the speed limit, okay to "go 55 in a 40, 55 in a 50."[4]
On June 4, 1995, Hubbard, Manson, and Gary Fergen, the assistant director of planning, met with John Morrison, the Spokane airport director, to discuss an application by a hotel firm to construct a new motel at the airport. Although there had been zoning issues involving the airport for several *605 years, it is unclear whether the hotel application had been at issue prior to this meeting. Manson expressed the opinion that the zoning code did not apply and saw no reason why a building permit could not be issued. Hubbard and Fergen disagreed with Manson's position. According to Fergen, Hubbard and Manson were "somewhat confrontational."[5] After the meeting, Hubbard sought the assistance of a county prosecutor in the civil division, James Emacio. Emacio agreed with Hubbard that issuing a permit would be in violation of the airport master plan and the county zoning code. A few minutes later, Hubbard received a conference call from Emacio and Manson, in which Emacio told Manson that he could not issue the permit without "plan or zoning modifications, which required public hearings."[6] On June 9, Emacio sent a letter to the attorney representing the hotel developer in which he stated that Manson's interpretation of the zoning code would not sustain legal challenge. That same day, Hubbard received a letter from Manson that stated, "your position of Planning Director will be eliminated."[7]
On June 12, the board of commissioners passed a resolution consolidating the building and planning departments under the supervision of Manson. On July 11, 1995, the board of commissioners terminated Hubbard's position, as well as two planner IV positions, held by Horobiowski and John Mercer, due to "reorganization."[8] Hubbard was not offered another position within the planning and building department.
Hubbard sued the County, Hasson, Harris, and Manson for wrongful termination of employment in violation of public policy. The defendants denied the allegation. They then moved for summary judgment, asserting that Hubbard had not identified a public policy violation and that the various violations of the county code alleged by Hubbard were merely interpretation disputes. Hubbard responded that Hasson exerted undue pressure on Hubbard and his staff to permit land use practices that "circumvented public hearings and other procedures established by county ordinance" and that the actions of Manson and Hasson violated RCW 42.23.070(1), which prohibits a municipal officer from granting "special privileges or exemptions [to] himself, herself, or others."[9] The trial court granted the defendants motion, holding that Hubbard failed to state a claim upon which relief could be granted.
Hubbard appealed and the Court of Appeals, Division Three, affirmed.[10] The court held that chapter 42.23 RCW "proscribes beneficial contractual interests on the part of municipal officers made by, through, or under the officer's supervision" and that the purpose of the chapter was to "increase the *606 pool of citizens eligible for public office."[11] Because the court found that Hubbard had not alleged any facts establishing an inference that the county officials involved "received beneficial financial interests from County contracts," he had not shown that the public policy had been violated.[12] The court also held that Hubbard had not established that he was discharged in violation of public policy because he "failed to show that other means of policing the zoning laws are inadequate."[13] It further stated that any interpretation of the zoning laws is likely to favor some property owners over others, thus, this was only an interpretation dispute. Therefore, the court affirmed the grant of summary judgment and denied Hubbard's motion for reconsideration. We granted Hubbard's petition for review.

II
Motions for summary judgment are reviewed de novo. Ellis v. City of Seattle, 142 Wash.2d 450, 458, 13 P.3d 1065 (2000).[14] The "`appellate court engages in the same inquiry as the trial court.'" Id. (quoting Trimble v. Wash. State Univ., 140 Wash.2d 88, 92-93, 993 P.2d 259 (2000)). "`Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.'" Id. (quoting Trimble, 140 Wash.2d at 92-93, 993 P.2d 259). A court must consider all facts and any reasonable inferences in the light most favorable to the nonmoving party. Id. A motion for summary judgment should only be granted "`"if, from all the evidence, reasonable persons could reach but one conclusion."`" Id. (quoting Trimble, 140 Wash.2d at 92-93, 993 P.2d 259 (quoting Clements v. Travelers Indem. Co., 121 Wash.2d 243, 249, 850 P.2d 1298 (1993))).
Employment contracts that are indefinite in duration may generally be terminated by either the employer or the employee at will. There is no dispute here that Hubbard is an "at-will" employee. However, this court has recognized an exception to this general rule when an employee is discharged in violation of public policy. Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 232, 685 P.2d 1081 (1984). In order to establish a claim for wrongful discharge in violation of public policy, a plaintiff must prove (1) the existence of a clear public policy (clarity element); (2) that discouraging the conduct in which they engaged would jeopardize the public policy (jeopardy element); and (3) that the public-policy-linked conduct caused the dismissal (causation element). Gardner v. Loomis Armored, Inc., 128 Wash.2d 931, 941, 913 P.2d 377 (1996). Finally, the "defendant must not be able to offer an overriding justification for the dismissal" (absence of justification element). Id.
In Thompson, we cautioned that "`courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject.'" 102 Wash.2d at 232, 685 P.2d 1081 (emphasis omitted) (quoting Parnar v. Americana Hotels, Inc., 65 Haw. 370, 380, 652 P.2d 625 (1982)). The public policy exception has generally been recognized in four different situations: where an employee is fired (1) for refusing to commit an illegal act; (2) for performing a public duty or obligation; (3) for exercising a legal right or privilege; and (4) in retaliation for reporting employer misconduct. Dicomes v. State, 113 Wash.2d 612, 618, 782 P.2d 1002 (1989).

A

Clarity Element
Whether a particular statute contains a clear mandate of public policy is a question of law. Roberts v. Dudley, 140 Wash.2d 58, 65, 993 P.2d 901 (2000). Hubbard asserts two public policy bases to support the clarity element. He first argues that by issuing a permit to build a new hotel at the airport, *607 Manson would have violated several provisions of the Spokane County Zoning Code as well as the airport master plan had he not intervened. Pet. for Review at 9-10. He further asserts that because the zoning code also prohibits the issuance of a permit that does not conform with the zoning code, had Manson been allowed to issue the permit for the motel, he would have violated that provision as well. Id. (citing Spokane County Zoning Code 14.408.020).[15]
The County responds that this was merely an interpretation dispute, that the zoning code is subject to a variety of interpretations, and, thus, creates no recognized public policy. Answer to Pet. for Review at 5-7. However, the County misreads the clarity element. The clarity element merely requires that the plaintiff establish a clear statement of public policy, not that the plaintiff demonstrate that the public policy was violated. See Gardner, 128 Wash.2d at 945, 913 P.2d 377 (finding "public policy of saving persons from life threatening situations satisfies the clarity element" before it evaluated whether the public policy had been violated).[16]
Although Washington courts have not yet addressed whether zoning and building codes are valid sources of public policy for wrongful discharge actions, two other states have recognized zoning and building codes as providing the necessary public policy. In Smith v. Farmers Cooperative Association, 825 P.2d 1323 (Okla.1992), the Oklahoma Supreme Court found that title 11, section 43-101 of the Oklahoma statutes, which provided for the general zoning power of municipalities, was a "statutory mandate of public policy." Id. at 1326. Thus, it held that the public policy exception to the employee-at-will doctrine applied when an employee was fired for acting in accordance with section 43-101. Id.
In Parada v. City of Colton, 24 Cal. App.4th 356, 29 Cal.Rptr.2d 309 (1994), the plaintiff alleged that he had been discharged for his enforcement or attempted enforcement of the building codes, ordinances and regulations and his failure to ignore violations of those codes and ordinances. 24 Cal. App.4th at 361, 29 Cal.Rptr.2d 309. The California Court of Appeal held that because the purpose of the California Uniform Building Code and the Colton Municipal Code was to "safeguard the public welfare," the plaintiff had established a valid public policy. Id. at 364, 29 Cal.Rptr.2d 309 (emphasis omitted).
The Spokane County Zoning Code was enacted under the authority of chapter 36.70 RCW. Spokane County Zoning Code, Preface (1998). RCW 36.70.010 states that, *608 [t]he purpose and intent of this chapter is to provide the authority for, and the procedures to be followed in, guiding and regulating the physical development of a county or region through correlating both public and private projects and coordinating their execution with respect to all subject matters utilized in developing and servicing land, all to the end of assuring the highest standards of environment for living, and the operation of commerce, industry, agriculture and recreation, and assuring maximum economies and conserving the highest degree of public health, safety, morals and welfare.[[17]]
Like the Oklahoma and California courts, we conclude that enforcement of the zoning code to ensure uniform planning and the general safety and welfare of the county creates a valid public policy for purposes of the clarity element. Similarly, because the airport master plan serves the same function of safety and uniformity as the zoning code,[18] it also creates a valid public policy.[19]
Hubbard next argues that the Court of Appeals misconstrued RCW 42.23.070(1) by ignoring the plain language of the statute and its legislative history. Pet. for Review at 12-14. Although chapter 42.23 RCW, as originally enacted in 1961, did address only conflict of interest situations, he contends that the 1994 amendment adding RCW 42.23.070(1) sought to encompass the larger issue of abuse of office. Id. Thus, he asserts that RCW 42.23.070(1) creates a public policy prohibiting a municipal employee from using "`his or her position to secure special privileges or exemptions for himself, herself, or others.'" Pet. for Review at 10-11 (quoting RCW 42.23.070(1)).
The County responds that the Court of Appeals correctly concluded that RCW 42.23.070(1) was merely intended to proscribe conflicts of interest. Answer to Pet. for Review at 7-8.[20] Because Hubbard presented no evidence that Manson had an interest in the hotel proposal, the County asserts that he failed to show a violation of the public policy. Id.
Relying on RCW 42.23.010 and .030, the Court of Appeals held that chapter 42.23 RCW merely proscribes "beneficial contractual interests on the part of municipal officers made by, through, or under the officer's supervision." Hubbard v. Spokane County, 103 Wash.App. 671, 678, 14 P.3d 806 (2000). The court held that even assuming that chapter 42.23 RCW contained a mandate of public policy, "the statute does not apply to the facts of this case." Id. As noted above, however, the clarity element does not require that a plaintiff demonstrate that the public policy was violated. Thus, the Court of Appeals need have decided only whether RCW 42.23.070(1) creates a valid public policy.
RCW 42.23.070 was enacted as part of the comprehensive Ethics in Public Service Act. Laws of 1994, ch. 154, § 121. Section 1 of the Ethics in Public Service Act provides the purpose for the Act. It states in part,
*609 Ethics in government are the foundation on which the structure of government rests. State officials and employees of government hold a public trust that obligates them, in a special way, to honesty and integrity in fulfilling the responsibilities to which they are elected and appointed. Paramount in that trust is the principle that public office, whether elected or appointed, may not be used for personal gain or private advantage.
The citizens of the state expect all state officials and employees to perform their public responsibilities in accordance with the highest ethical and moral standards and to conduct the business of the state only in a manner that advances the public's interest.
Laws of 1994, ch. 154, § 1. Although section 1 refers to state officials and employees, the Ethics in Public Service Act applies to municipal officers as well. See Laws of 1994, ch. 154, § 121 (regulating ethical behavior of municipal officers). It is, therefore, appropriate that the purpose articulated in section 1 would apply equally to all government employees affected by the act.
Based on the plain language of RCW 42.23.070(1) and the legislative intent in enacting the Ethics in Public Service Act, the Court of Appeals erred in limiting the purpose of the statute to situations only involving conflicts of interest. RCW 42.23.070(1) clearly prohibits municipal officers from using their positions to secure special privileges or exemptions for others.[21] Thus, its plain language does not limit the prohibition to only conflict of interest situations. Furthermore, the express purpose of the act was to ensure that government officials conducted business in a "manner that advances the public's interest." Laws of 1994, ch. 154, § 1. We therefore hold that RCW 42.23.070(1) creates a valid public policy in favor of prohibiting municipal officers from granting special privileges or exemption to others. In so holding, we recognize the burden this may place on public officials. However, because public officials serve the interests of the citizens of Washington, consistent with the Ethics in Public Service Act, we find it appropriate to hold them to a high standard.

B

Jeopardy Element
To establish the jeopardy element, a plaintiff must show that he or she "engaged in particular conduct, and the conduct directly relates to the public policy, or was necessary for the effective enforcement of the public policy." Gardner, 128 Wash.2d at 945, 913 P.2d 377 (emphasis omitted). This requires the plaintiff to "`argue that other means for promoting the policy ... are inadequate.'" Id. at 945, 913 P.2d 377 (quoting 1 HENRY H. PERRITT, JR., WORKPLACE TORTS: RIGHTS AND LIABILITIES § 3.14, at 77 (1991)). The plaintiff must also "show how the threat of dismissal will discourage others from engaging in the desirable conduct." Id. Finally, in determining whether the public policy has been contravened or jeopardized, a *610 court must look to the "letter or purpose of a statute." Dicomes, 113 Wash.2d at 620, 782 P.2d 1002.
Hubbard argues that the Court of Appeals erred in concluding that he failed to satisfy the jeopardy element. Pet. for Review at 15-17. He asserts that because he was discharged for complaining about and preventing violations of the zoning code and RCW 42.23.070(1), the public policy of enforcing these laws was violated. Id. He argues that this case is factually analogous to Ellis and Thompson, and thus, the Court of Appeals decision conflicts with the holdings in those cases. Id.
In concluding that Hubbard had failed to satisfy the jeopardy prong, the Court of Appeals stated that "any interpretation of a zoning law is likely to `favor' some property owners and `disfavor' other property owners." Hubbard, 103 Wash.App. at 679, 14 P.3d 806. Thus, relying on Dicomes, it reasoned that Hubbard's claims were simply interpretation disputes. Id.
We find, however, that Hubbard's case is distinguishable from Dicomes. In Dicomes, the plaintiff alleged that she was fired for releasing information regarding her employer's, the director of the department of licensing, alleged illegal activity. 113 Wash.2d at 616, 782 P.2d 1002. In order to show that the director's actions were illegal, the plaintiff argued that the statutory scheme embodied "a clear mandate that all funds collected and deposited in the medical disciplinary account must be used for medical disciplinary purposes." Id. at 621, 782 P.2d 1002. The court disagreed, however, concluding that the statutory scheme merely authorized "the Director to allocate appropriated funds to accomplish the purposes of the law." Id. at 623, 782 P.2d 1002. Because, the court found that the director had not violated the law, the plaintiff's "difference of opinion" as to her supervisor's course of action was "too tenuous a ground upon which to base a claim for wrongful discharge." Id. at 624, 782 P.2d 1002.
In this case, Hubbard presents evidence that Manson's acts were in fact in violation of the applicable zoning codes. The county prosecutor indicated that he had "some reservations about an interpretation [of the zoning code] which would withstand any legal challenge" and that the hotel proposal is "not consistent with the Airport Master Plan." CP at 42. Therefore, Hubbard's efforts to prevent the issuance of the permit in violation of the law would be a protected activity.
Our decisions in Ellis and Thompson are more analogous to Hubbard's case than Dicomes. In Ellis, we evaluated whether the plaintiff had presented sufficient facts to satisfy the jeopardy element. 142 Wash.2d at 460, 13 P.3d 1065. Ellis argued that he had been fired for raising questions about the legality of disabling the public address component of the fire alarm system. Id. at 452, 13 P.3d 1065. The city responded that Ellis had not been asked to work on the fire alarm system, but only on the public address system, which would not violate the recognized public policy. Id. at 461-62, 13 P.3d 1065. The court concluded that this was a question of fact that should go to the jury for determination. Id. at 463, 13 P.3d 1065.
In Thompson, this court reversed the trial court's grant of summary judgment in favor of the defendant. 102 Wash.2d at 234, 685 P.2d 1081. Thompson had argued that he was fired for "instituting an accurate accounting program in compliance with the Foreign Corrupt Practices Act of 1977." Id. The court reasoned that whether Thompson had been discharged for insisting that his employer comply with the statute presented an issue of material fact for the jury. Id.
This case is also analogous to Harless v. First National Bank, 162 W.Va. 116, 246 S.E.2d 270 (1978), which has been favorably cited by this court. See Dicomes, 113 Wash.2d at 620, 782 P.2d 1002; Thompson, 102 Wash.2d at 231, 685 P.2d 1081. In Harless, a bank employee was discharged after attempting to make his employer comply with the state consumer credit and protection laws. 246 S.E.2d at 272. The West Virginia Supreme Court held that the bank could be liable for wrongful discharge because the discharge would otherwise frustrate a clear public policy to protect consumers. Id. at 276.
*611 As Ellis, Thompson, and Harless, Hubbard asserts that he was discharged for protesting and/or preventing illegal acts by his employer. Specifically, Hubbard sought the assistance of a county prosecutor to prevent Manson from issuing a permit to build a new hotel at the airport. According to the county prosecutor, issuing the permit would be in violation of both the zoning code and the airport master plan. If, in fact, granting the permit would have violated the law, Manson would have also violated RCW 42.23.070(1) by granting a special privilege to another. Thus, Hubbard's actions would arguably have been necessary to enforce the public policy articulated both by the zoning code and RCW 42.23.070(1).
The County asserts that decisions made in the course of planning are not "special privileges." Answer to Pet. for Review at 10. As the Court of Appeals noted, many zoning and development decisions will favor one party over another. Hubbard, 103 Wash.App. at 679, 14 P.3d 806. However, when a decision is made in favor of one party and that decision violates the zoning code, it is appropriate to consider the decision a special privilege because the favored party could not have received the benefit of the decision without a violation of the law.
The County also argues that the dispute between Manson and Hubbard regarding the hotel proposal was just a difference of opinion, which was resolved by the prosecutor.[22] Answer to Pet. at 6. Thus, it argues that the public policies were not violated. Id. We disagree. Considering the facts in the light most favorable to Hubbard, whether this was merely an interpretation dispute or an actual violation of public policy would at least raise a question of material fact.
The County next contends that the Court of Appeals correctly held that Hubbard "failed to show that other means of policing the zoning laws are inadequate." Hubbard, 103 Wash.App. at 679, 14 P.3d 806. The County asserts that even if Manson had issued the permit, it was still subject to administrative challenge pursuant to RCW 36.70.830. Answer to Pet. for Review at 9. RCW 36.70.830 provides for appeals to the board of adjustment, "by any person aggrieved, or by any officer, department, board or bureau of the county affected by any decision of an administrative official."
Hubbard responds that the administrative appeal was not available to him because he was the administrative official. Pet. for Review at 18. Thus, there was no "normal hearing procedure" available to him to overturn Manson's proposed action. Id. Hubbard misreads this requirement. The other means of promoting the public policy need not be available to a particular individual so long as the other means are adequate to safeguard the public policy. See 1 PERRITT, supra, § 3.14, at 77.
However, this does not end our inquiry. Even though a zoning decision can be challenged administratively, this alternative is insufficient to safeguard the public policies embodied in the zoning code and RCW 42.23.070(1). Because the appellate procedures in RCW 36.70.830 require that an aggrieved citizen receive notice of the zoning actions and act within a relatively short time frame (within 20 days of the action), it would often be left up to chance whether the public policy was enforced. In contrast, it would be more efficient to allow county employees to prevent these types of violations before they occurred.[23]
Finally, Hubbard asserts that he was discharged as a warning to other "county planners not to stand in the way of [the] illegal issuance of building permits." Pet. for Review at 19. In light of Manson's telling Hubbard that he no longer needed to attend *612 planning department meetings after Hubbard disagreed with Manson's position that the zoning code was merely a regulation that could be changed administratively and Manson's statements at subsequent meetings that county planners should "bend" the code if necessary to reach the desired result, we conclude that it is likely that Hubbard's discharge served as a warning to other planners to follow Manson's directives even if they violated the law.
We therefore hold that a material issue of fact remains as to whether Manson's actions violated the zoning code and RCW 42.23.070(1) or whether it was merely an interpretation dispute.

C

Causation and Absence of Justification Elements
The Court of Appeals concluded that given the timing of Hubbard's discharge, a material fact existed "as to whether the County discharged ... Hubbard for his objection to the airport motel issue." Hubbard, 103 Wash.App. at 679, 14 P.3d 806. This conclusion does not appear to be challenged by either party. This holding is accepted.
Finally, the Court of Appeals concluded that because Hubbard failed to satisfy the clarity and jeopardy elements, the County had no burden to prove that Hubbard's dismissal was for a legitimate cause. Hubbard, 103 Wash.App. at 679, 14 P.3d 806 (citing Thompson, 102 Wash.2d at 232-33, 685 P.2d 1081). However, because Hubbard has met the clarity element and a question of fact remains as to the jeopardy and causation elements, the burden does shift to the County to show an overriding justification for Hubbard's dismissal. See Gardner, 128 Wash.2d at 941, 913 P.2d 377. The County argues that the dismissal was part of a reorganization of the public works department. On the other hand, Hubbard asserts that his dismissal was in retaliation for preventing Manson from issuing a permit to build a new airport hotel. We, therefore, conclude that a question of fact also remains as to this element.

III
Reading the facts in the light most favorable to Hubbard, we hold that Hubbard has satisfied the clarity element and that issues of material fact remain as to the jeopardy, causation, and absence of justification elements. Thus, the trial court erred in granting the County's summary judgment motion. The Court of Appeals decision is reversed and the case remanded to the trial court for further proceedings consistent with this opinion.
ALEXANDER, C.J., SMITH, JOHNSON, IRELAND, CHAMBERS and OWENS, JJ., concur.
MADSEN, J. (dissenting).
The majority says it finds "clear" public policy in RCW 42.23.070(1) and the Spokane County Zoning Code. To reach this conclusion, the majority combines an expansive explanation of provisions of the Ethics in Public Service Act and unclear provisions of the zoning code. The record shows that a highly involved analysis of a county-airport agreement, the airport master plan, the county zoning code, and chapter 58.17 RCW are necessary before any determination can be made that issuance of a building permit for a new motel at the airport might have violated zoning laws. If any public policy can be gleaned here, it is anything but clear.
The result of the majority's opinion is that the narrow public policy exception swallows the terminable at will rule, and, sadly, does so under circumstances where the employer would be hard-pressed to discover any clear mandate of public policy violated by discharging the employee. The majority has departed from the limiting principles in Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 685 P.2d 1081 (1984), the case in which this court recognized the tort of wrongful discharge in violation of public policy.
Moreover, the majority rejects an existing alternative for safeguarding the public policy it identifies, instead opting in favor of the wrongful discharge tort because, the majority says, it is "more efficient." The majority *613 thus injects a completely new subjective standard for deciding when to permit a claim of wrongful discharge in violation of public policy.

I.
The public policy exception to the terminable at will doctrine is founded on the premise that the common law doctrine "cannot be used to shield an employer's action which otherwise frustrates a clear manifestation of public policy." Thompson, 102 Wash.2d at 231, 685 P.2d 1081. The public policy exception is a "narrow" exception. Sedlacek v. Hillis, 145 Wash.2d 379, 385, 36 P.3d 1014 (2001); Snyder v. Med. Serv. Corp. of E. Wash., 145 Wash.2d 233, 239, 35 P.3d 1158 (2001); Thompson, 102 Wash.2d at 232, 685 P.2d 1081. "[C]ourts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject." Thompson, 102 Wash.2d at 232, 685 P.2d 1081 (quoting Parnar v. Americana Hotels, Inc., 65 Haw. 370, 380, 652 P.2d 625 (1982)). One of the reasons for judicial carefulness is "to avoid allowing an exception to swallow the general rule that employment is terminable at will." Sedlacek, 145 Wash.2d at 390, 36 P.3d 1014. "[T]he asserted public policy must be clear." Id. at 389, 36 P.3d 1014.
The employee has the burden of proving that a "clear mandate of public policy" may have been contravened. Thompson, 102 Wash.2d at 232, 685 P.2d 1081. This "protects against frivolous lawsuits and allows trial courts to weed out cases that do not involve any public policy principle. It also allows employers to make personnel decisions without fear of incurring civil liability." Thompson, 102 Wash.2d at 232, 685 P.2d 1081. The majority holds that Mr. Hubbard has satisfied his burden of establishing a clear mandate of public policy. The majority finds that Hubbard has identified the necessary public policy in RCW 42.23.070(1) and the Spokane County Zoning Code.
Mr. Hubbard alleges that Mr. Manson, the director of the Spokane Building and Planning Department and Hubbard's supervisor, attempted to unlawfully circumvent the zoning code and issue a building permit for a motel at the airport. Hubbard says this would have violated the zoning code. Hubbard also reasons that Manson's attempt to issue a building permit, if successful, would have contravened RCW 42.23.070(1). Mr. Hubbard says that he was discharged for complaining about and preventing violations of RCW 42.23.070 and the zoning code. Thus, the argument goes, Hubbard's dismissal violated the public policy voiced in the statute as well as public policy embodied in the zoning code.
Turning first to RCW 42.23.070(1), this statute prohibits a municipal officer from using his or her position to obtain special privileges or benefits for himself, herself or others. Other sections in the statute prohibit a municipal officer from giving or receiving compensation, gifts, or the like for a matter related to his or her services unless allowed by law; from accepting employment or business or professional activity that he or she might reasonably expect would lead to disclosure of confidential information acquired by reason of his or her official position; and from disclosing confidential information gained in that position or using such information for his or her gain or benefit.[1] "Municipal officer" and "officer" are defined terms, and "shall each include all elected and appointed officers of a municipality, together with all deputies and assistants of such an *614 officer, and all persons exercising or undertaking to exercise any of the powers or functions of a municipal officer[.]" RCW 42.23.020.
The majority maintains that Mr. Manson is a "municipal officer" or an "officer" within the meaning of RCW 42.23.070(1). While this is a debatable proposition,[2] even assuming it is true, the majority expands RCW 42.23.070(1) by reading into it general ethical obligations set out in Laws of 1994, ch. 154, § 1. That provision, part of the Ethics in Public Service Act, Laws of 1994, ch. 154, addresses general ethical standards for state employees, and was codified at RCW 42.52.900. Chapter 42.52 RCW concerns ethics in public service and deals exclusively with state agencies, state officers, and state employees. The majority says, though, that although section 1 (RCW 42.52.900) refers only to state employees, the Ethics in Public Service Act applies to municipal officers as well, and therefore applies equally to municipal officers. For this proposition, the majority cites Laws of 1994, ch. 154, § 121which is the very section codified at RCW 42.23.070(1). In this circular fashion, the majority ultimately relies upon RCW 42.23.070 itself as supporting the proposition that it should be expanded to include broad ethical principles not actually appearing within the statute. I disagree with the majority's attempt to shore up its use of RCW 42.23.070(1) as a source of public policy by importing into it RCW 42.52.900.
However, the greater flaw in the majority's analysis is its acceptance of Mr. Hubbard's claim that the county zoning code sets forth a clear mandate of public policy. This "public policy," in combination with RCW 42.23.070(1), is the basis for the public policy tort recognized by the majority.
Assuming that zoning laws could, in some cases, embody relevant public policy, the zoning code is also insufficient as a source of public policy in this case because Mr. Hubbard has not carried his burden of establishing that it provides a clear mandate of public policy. In his appellate briefing he never identifies any section or sections of the zoning code that could have been violated by issuance of a building permit for the proposed new motel at the airport, nor does he cite any zoning provision or provisions or principle or principles that are relevant. He merely asserts that a motel was not permitted by the zoning code or the airport's "comprehensive plan."[3]
The majority concludes that "enforcement of the zoning code to ensure uniform planning and the general safety and welfare of the county creates a valid public policy." Majority at 608. This is simply too broad a proposition. As this court explained in Thompson, 102 Wash.2d at 232, 685 P.2d 1081 (quoting Parnar, 65 Haw. at 380, 652 P.2d 625) ("`[i]n determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme.'") That determination cannot be made without knowing what particular constitutional provision, statute, regulatory provision or scheme may have been contravened. "Public policy in the air," so to speak, is meaningless. For example, Mr. Hubbard could argue that there is a clear mandate of public policy prohibiting retaliatory discharge for asserting rights under the Workers' Compensation Act.[4] Obviously, that public policy would be completely irrelevant here in light of the factual allegations in this case. Thus, Mr. Hubbard needs to show a clear mandate of public policy that would be contravened if his factual allegations are true. See Thompson, 102 Wash.2d at 232, 685 P.2d 1081 (the employee has the burden of proving that a "clear mandate of public policy" may have been contravened). This *615 requires that at a minimum he establish the specific zoning provisions or principles that would have been contravened, given his factual allegations. A number of cases are illustrative. E.g., Sedlacek, 145 Wash.2d at 390-91, 36 P.3d 1014 (examining specific provisions in chapter 49.60 RCW and the Washington Administrative Code, as well as a prior decision by this court, to determine whether there is any state public policy protecting those who are related to or associate with a person with a disability, and finding none); Ellis v. City of Seattle, 142 Wash.2d 450, 459-60, 13 P.3d 1065 (2001) (accepting principle that clear public policy was set forth in a specific provision of the Seattle Fire Code); Gardner v. Loomis Armored, Inc., 128 Wash.2d 931, 942, 913 P.2d 377 (1996) (plaintiffs advanced several possible sources of policy; as to one of the arguments, the court examined specific statutes that plaintiffs argued established a clear general public policy encouraging citizens to help in law enforcement, and found no such policy). It is not enough for Mr. Hubbard to simply declare that issuance of a building permit for a motel at the airport would have violated zoning laws, and not enough for the majority to simply assume that the zoning code creates valid public policy applicable in this case.
The majority claims that I have mixed the clarity and jeopardy elements of the public policy tort. The majority is mistaken. The four-element formula this court adopted in Gardner is the test proposed by Henry Perritt, Jr. Gardner, 128 Wash.2d at 941, 913 P.2d 377. Perritt says that the clarity element is the threshold question: "what public policy might be jeopardized if the plaintiff's dismissal were allowed to go uncompensated." 1 HENRY H. PERRITT, JR., EMPLOYEE DISMISSAL LAW AND PRACTICE § 5.10, at 446 (3d ed.1992) (footnote omitted). The clarity element must be identified with "particularity." Id. at 447, 913 P.2d 377. In describing cases where plaintiffs failed to establish the element with sufficient specificity, Mr. Perritt notes that in one case the plaintiff never got specific enough as to what state law was violated "and how the proposed employer conduct was illegal." Id. at 447-48, 913 P.2d 377.
The majority fails to identify with sufficient specificity a "clear" mandate of public policy that would have been violated if the permit for the proposed motel had been granted. This necessarily requires consideration of the factual circumstances alleged, and greater specificity than the general "health, safety, and welfare" police power statement accompanying zoning codes that the majority relies on.
The jeopardy element, in contrast, requires the employee to prove that "the public policy would be jeopardized if employers are allowed to dismiss employees for the conduct in which the plaintiff engaged." Id. § 5.16. Stated a different way, the plaintiff must show that "the public policy asserted by the plaintiff would be jeopardized if employee conduct like the plaintiff's were chilled by the threat of dismissal." Id. (footnotes omitted). Thus, once plaintiff has satisfied the clarity element, the next question is whether the public policy is furthered or protected by recognizing a wrongful discharge claim, the jeopardy element.[5]
Just as Mr. Hubbard's briefing inadequately identifies any clear mandate of public policy in the zoning code, the record also fails to establish a clear mandate of public policy. The record includes Mr. Hubbard's affidavit, in which he makes the same allegations about the zoning code and airport comprehensive plan, but does not refer to any specific provisions or principles. The record supports his statements that he and his supervisor, Mr. Manson, disagreed about whether a new motel fell within permitted accessory uses at the airport, and that in a meeting with representatives from the airport Hubbard and Manson became somewhat confrontational about this issue. It also supports his claim that a deputy in the prosecutor's office, civil division, advised both Mr. Manson and the proposed builder's attorney that a building permit for a motel would probably not withstand a legal challenge.
The record includes the letter of advice written by that deputy prosecuting attorney, *616 Mr. Emacio, to the proposed builder's attorney. This letter is the only thing in the record that actually addresses relevant zoning provisions, and it does not support the conclusion that there is a clear mandate of public policy relevant to this case. Mr. Emacio wrote that a county-airport agreement provided that capital improvements at the airport shall be in accordance with the airport master plan and that "aviation capital improvements and land uses conforming with said Master Plan shall not be [the] subject [of] City or County zoning regulations." Clerk's Papers (CP) at 41. Mr. Emacio then said that as he had indicated in the past, the motel proposal did not "appear[ ]" to be consistent with the master plan. CP at 42. He added, however, that it was arguable that as long as the proposal was consistent with the zoning code, it could proceed. Id. He then explained his understanding that the property involved was zoned I-2, that the airport could be construed as a valid nonconforming use (since I-2 zoning did not permit an airport), and that under the code accessory uses are allowed in I-2 zones (he also cited a case permitting an accessory use in conjunction with a valid nonconforming use). Id. Mr. Emacio then explained that while initially a motel could be considered a valid accessory use to the airport, this analysis "is somewhat diluted by additional provisions" in the zoning code, specifically a requirement that an accessory use be incidental to that same use on the same lot. Id. "Lot" was defined in the code, and required segregation by the county assessor. Id. Mr. Emacio then explained that platting provisions in chapter 58.17 RCW exempt industrial or commercial use from formal platting divisions when approved in a binding site plan. Id. He then said that he therefore believed it was necessary to construe the airport master plan as a binding site plan. Id. (This means that the airport master plan had to be used to identify a "lot" for purposes of the county zoning code provision respecting accessory uses on the same loteven though Mr. Emacio had concluded that the airport master plan did not control the building permit issue because a motel was not consistent with that master plan). Mr. Emacio then wrote that "[i]f that is the case, then [the motel] proposal would not be on the same lot as the Airport and as such, could not be considered an accessory use." Id. He concluded that "[t]he County is certainly willing to explore this `zoning interpretation proposal' with the Airport. However, I have some reservations about an interpretation which would withstand any legal challenge." Id.
Mr. Emacio's letter discloses that whether a motel was a permitted accessory use required an examination of the county-airport agreement, the airport master plan, several provisions in the county zoning code, chapter 58.17 RCW and its exemptions, an inference (i.e., that the airport master plan was a binding site plan for it to comply with chapter 58.17 RCW), interrelating the various documents and the state and local law provisions, and interpretation of all of these.
In the end, Mr. Emacio did not unequivocally state that issuing the building permit would be against the law, but rather that he had reservations about an interpretation allowing issuance of a permit. Thus, even Mr. Emacio's letter, the only source of any discussion of applicable law, does not show any zoning provisions or principles that declare a clear public policy that would have been violated.
Based on the information in the record regarding the relevant zoning law (Mr. Emacio's letter) and the facts as Mr. Hubbard alleges them, there is room for the County's argument that all that occurred here was an interpretational dispute about what the law required. The majority too hastily dismisses the County's argument that zoning code provisions that are amenable to different interpretation cannot provide clear public policy. While the majority says that this argument involves the question whether a violation of the zoning laws occurred, majority at 607, it does not. Instead, it is a highly relevant argument going to the clarity element. If applicable zoning laws are subject to more than one reasonable interpretation, they do not provide a clear mandate of public policy on which to base a tort actionthey do not provide any clear direction at all. Accordingly, the clarity of the zoning provisions in this case is a relevant consideration.
*617 As the majority itself acknowledges, majority at 604-05, there had been zoning issues concerning the airport for years. Mr. Manson and Mr. Hubbard disagreed about whether a motel was permitted as an accessory use. The record shows, as the County argues, that this is not a case involving a possible contravention of clear public policy, but is instead a matter of an interpretational dispute involving zoning and other laws open to differing interpretation. This court should not find a clear mandate of public policy where there is room to differ as to the meaning of the relevant zoning laws.
Far more importantly, aside from whether there are two reasonable interpretations of the relevant zoning laws, this court should not find a "clear mandate of public policy" in zoning laws requiring the complicated analysis, inferences, and interpretations contained in Mr. Emacio's letter. Thompson, 102 Wash.2d at 232, 685 P.2d 1081. There appears to be little that is "clear" in the whole analysis.
Finally, this record shows that there was discussion of amending the zoning code to allow for a motel use as a way to avoid any possible pitfalls that might be created by different legal interpretations of existing laws and documents. Given that a zoning amendment would have resolved the interpretative dispute and allowed permitting of a motel use, it is difficult to see what clear mandate of public policy is announced by the majority that would have been violated in the absence of such a zoning amendment. Clearly, no actual threat to health, safety or the public welfare was at issue in this case.
I would hold that Mr. Hubbard has not established any clear mandate of public policy, and thus his wrongful discharge claim fails. The trial court properly granted summary judgment.

II.
Since I would affirm the grant of summary judgment in favor of respondents on the basis that no clear mandate of public policy has been established, I would not reach any further issues. However, the majority has addressed the jeopardy element, and, in my view, has reached the wrong conclusion. Therefore, I turn briefly to this issue.
To establish the jeopardy element of the wrongful discharge tort action, the plaintiff must show that he or she "engaged in particular conduct [that] ... directly relates to the public policy, or was necessary for the effective enforcement of the public policy." Gardner, 128 Wash.2d at 945, 913 P.2d 377 (emphasis omitted). This requires the plaintiff to establish that "`other means for promoting the [public] policy ... are inadequate.'" Id. (quoting HENRY H. PERRITT, JR., WORKPLACE TORTS: RIGHTS AND LIABILITIES § 3.14, at 77 (1991)).
As the majority notes, RCW 36.70.830 grants the right to appeal a decision to grant a building permit to the board of adjustment "by any person aggrieved, or by any officer, department, board or bureau of the county affected." The majority concludes, however, that this is not an acceptable alternative means of promoting the public policies embodied in RCW 42.23.070(1) and the zoning code. The majority says that an aggrieved person must receive notice and act within a short period of time, and thus it would be left up to chance whether the public policy would be enforced. Majority at 611. The majority says that it would be "more efficient to allow county employees to prevent these types of violations before they occurred." Id.
I disagree with the majority's declaration of a "more efficient" standard for determining whether an alternative means exists for promoting the public policy. It is a standard that lends itself to ad hoc decisions, rather than a standard that will effectively identify those cases where the public policy tort action is necessary to further a clear mandate of public policy. Further, it is difficult to see how using a public policy tort lawsuit to protect public policy is "more efficient" than using the appeal process to the board of adjustment, which is, after all, the body best equipped to decide land use issues.
I also disagree with the majority's conclusion that the appeals process is inadequate because the time for appeal is short. Plainly, the Legislature was of the mind that the time was sufficient to allow appeals by aggrieved *618 persons who may complain that a building permit was issued in violation of the zoning laws. The majority's view contradicts that of the Legislature. Moreover, such time limitations as in this case, 20 days, are routinely applied as valid. See, e.g., Deschenes v. King County, 83 Wash.2d 714, 521 P.2d 1181 (1974) (10 day appeal period). Finally, to the extent that public policy is involved in permit decisions, such policy is better protected through the relatively quick appeals process as opposed to a lengthy civil action.
I would hold that there is an effective alternative method for promoting the public policy that Mr. Hubbard and the majority identify.

III.
Mr. Hubbard has failed to identify any relevant clear mandate of public policy that may have been contravened by his dismissal, and has failed to show that there is no adequate alternative method of promoting those public policies he asserts were violated in this case. Accordingly, the summary judgment of dismissal of his action should be affirmed. I dissent from the majority opinion.
SANDERS, J., concurs.
NOTES
[1] Clerk's Papers (CP) at 27.
[2] CP at 28.
[3] CP at 81.
[4] CP at 94.
[5] CP at 65.
[6] CP at 29.
[7] CP at 29, 45. In a footnote in his petition for review, Hubbard also asserts several instances preceding the events involving Manson in which County Commissioner Steve Hasson "brought pressure to bear on the Planning Department and Mr. Hubbard to circumvent the requirements for public hearing and thereby grant special privileges or exemptions to favored citizens." Pet. for Review at 14. These incidents include: (1) requesting that the planning department permit a citizen to construct a 65-foot breezeway to connect two buildings on a lot that was zoned to allow only one structure so that the structure could be designated a duplex, CP at 98-99; (2) advocating for an increase in the size of a mall project in excess of the amount that the zoning code allowed Hubbard to approve, CP at 25, 37; (3) directing Hubbard to grant a time extension to the mall developer and to refrain from circulating the time extension request to "affected agencies and departments" for comment as required by the county subdivision ordinance, CP at 25; (4) directing Hubbard to approve an application to extend a nonconforming use without following the conditional use permit process in King County Zoning Code 14.508.040, CP at 23-24, 34; and (5) unilaterally approving a building permit to construct a 14-foot high retaining wall even though it arguably exceeded the permitted height of a fence by eight feet, CP at 24-25, 36, 56-58. Because these incidents were only raised in a footnote, we need not consider them when evaluating Hubbard's claims. See State v. Johnson, 69 Wash.App. 189, 194 n. 4, 847 P.2d 960 (1993).
[8] CP at 29.
[9] CP at 11-12.
[10] Hubbard v. Spokane County, 103 Wash.App. 671, 14 P.3d 806 (2000).
[11] Id. at 678, 14 P.3d 806.
[12] Id.
[13] Id. at 679, 14 P.3d 806.
[14] Although the trial court entered findings of fact, because summary judgment motions are reviewed de novo, these findings are superfluous and need not be considered. Duckworth v. City of Bonney Lake, 91 Wash.2d 19, 21-22, 586 P.2d 860 (1978).
[15] Spokane County Zoning Code 14.408.020 states:

Before signing off the Building permit, the Department must find that the proposal:
1. Conforms in all respects to the provisions of this Code, including the use provisions and development standards; and
2. Conforms in all respects to the provisions of any special conditions required by the Board, Hearing Body, and/or Department.
3. Conforms in all respects to the applicable provisions within each NEIGHBORHOOD/COMMUNITY (N/C) OVERLAY CHAPTER.
4. Conforms in all respects to the applicable provisions within Chapter 14.710, ARTERIAL/ROAD OVERLAY.
[16] Although prior to Gardner, the wrongful discharge tort required that the employee prove that his or her "dismissal violates a clear mandate of public policy," Thompson, 102 Wash.2d at 232, 685 P.2d 1081, by adopting the four-prong analysis, Gardner divided this requirement into two separate elementsthe clarity prong and the jeopardy prong. Gardner, 128 Wash.2d at 941, 913 P.2d 377. The dissent seems to reject this distinction. See dissent at 8. Furthermore, the dissent's reliance on Gardner, Ellis, and Sedlacek v. Hillis, 145 Wash.2d 379, 36 P.3d 1014 (2001) to support its position that the employee must prove both that a public policy exists and that it has been contravened to establish the clarity element is misplaced. In Gardner, the court concluded that the public policy of saving persons from life threatening situations satisfied the clarity element before it evaluated whether the public policy had been violated. 128 Wash.2d at 945, 913 P.2d 377. In Ellis, the court did not examine whether the plaintiff had established the clarity element because the employer did not challenge the Court of Appeals holding that the employee had established a clear mandate of public policy that satisfied the clarity element. 142 Wash.2d at 459-60, 13 P.3d 1065. In Sedlacek, the court never had to determine whether the public policy had been contravened, because it concluded that there was no clear mandate of public policy in Washington supporting the claim. 145 Wash.2d at 393, 36 P.3d 1014.
[17] See also Spokane County Zoning Code 14.100.104 ("[t]he general purpose of this Zoning Code is to promote the health, safety, and general welfare").
[18] In his letter to the hotel developer's counsel, Emacio refers to the airport master plan as a "binding site plan," which is governed by chapter 58.17 RCW. CP at 42. The purpose of chapter 58.17 RCW is to "regulate the subdivision of land and to promote the public health, safety and general welfare in accordance with standards established by the state." RCW 58.17.010.
[19] Even if we agreed with the dissent that Hubbard must also show that the public policy was contravened in order to establish the clarity element, it would seem improper to dismiss his claim on this basis because, as the dissent acknowledges, there is at least a question of fact as to whether the zoning code was violated. See dissent at 616 (acknowledging that Emacio's letter was not decisive on the issue of whether the code had been violated and that there was "room" for the County's argument that the disagreement only involved an interpretation dispute).
[20] In its supplemental brief, the County also asserts that "[t]he definition of special privileges specifically excludes the performance of duties within the scope of employment." Suppl. Br. of Resp't at 16. However, in support of this proposition, it improperly relies on RCW 42.52.070. Although RCW 42.52.070 uses language similar to that used in RCW 42.23.070(1), because it addresses the granting of special privileges or exemptions by state employees and not municipal employees, it is not applicable to this case.
[21] RCW 42.23.020(1) defines "municipality" as including "all counties, cities, towns, districts, and other municipal corporations and quasi municipal corporations organized under the laws of the state of Washington." A "municipal officer" or "officer" includes "all elected and appointed officers of a municipality, together with all deputies and assistants of such an officer, and all persons exercising or undertaking to exercise any of the powers or functions of a municipal officer." RCW 42.23.020(2). The dissent asserts that it is "debatable" whether Manson is a "`municipal officer' or an `officer'" within the statutory definition. Dissent at 4-5. Manson, however, is not an ordinary county employee, but is the director of the building and planning department with statutory authority to oversee and enforce the building and zoning codes. As director of the building and planning department, Manson was designated by county ordinance as the "building official for the county" who was authorized to enforce the provisions of the building code, including the promulgation of rules, policies, or procedures to carry out the intent of the code and to provide for the "efficient operation of the permit process." Spokane County Code § 3.02.010 (emphasis added). Furthermore, as director of planning, Manson was "appointed by the Board of County Commissioners" to "[direct] the activities of the Planning Department." Spokane County Zoning Code 14.300.100 (emphasis added). Because he was an "appointed" officer of the County and a "person[ ] exercising or undertaking to exercise any of the powers or functions of a municipal officer," Manson clearly fits within the statutory definition of "officer." RCW 42.23.020(2).
[22] The County's position that this was just a routine interpretation dispute that was submitted to a prosecutor for an opinion is somewhat misleading. Emacio was informed of Manson's plan to issue the permit by Hubbard. CP at 29, 188. After intervening, Emacio felt it necessary to write a letter to the hotel developer's attorney in order prevent the issuance of the permit. See CP at 41-43.
[23] Despite the dissent's assertion, the efficiency in allowing county employees to prevent these types of violations before they occur stems from the employees ability to speak out against the violations without fear of discharge.
[1] RCW 42.23.070 states:

(1) No municipal officer may use his or her position to secure special privileges or exemptions for himself, herself, or others.
(2) No municipal officer may, directly or indirectly, give or receive or agree to receive any compensation, gift, reward, or gratuity from a source except the employing municipality, for a matter connected with or related to the officer's services as such an officer unless otherwise provided for by law.
(3) No municipal officer may accept employment or engage in business or professional activity that the officer might reasonably expect would require or induce him or her by reason of his or her official position to disclose confidential information acquired by reason of his or her official position.
(4) No municipal officer may disclose confidential information gained by reason of the officer's position, nor may the officer otherwise use such information for his or her personal gain or benefit.
[2] See generally 56 Am.Jur.2d Municipal Corporations, Counties, and Other Political Subdivisions § 206 (2000); cf. State ex rel. McIntosh v. Hutchinson, 187 Wash. 61, 59 P.2d 1117 (1936) (discussing "officer" for purposes of Const. art. II, §§ 13, 14); Nelson v. Troy, 11 Wash. 435, 39 P. 974 (1895) (discussing "officer" for purposes of Const. art. XI, § 5).
[3] The "comprehensive plan" is referred to elsewhere in the record as the airport master plan.
[4] E. g., Wilmot v. Kaiser Aluminum & Chem. Corp., 118 Wash.2d 46, 821 P.2d 18 (1991).
[5] I also note that Mr. Perritt proposes that both the clarity and jeopardy elements present questions of law. 1 HENRY H. PERRITT, JR., EMPLOYEE DISMISSAL LAW AND PRACTICE § 5.9 (3d ed.1992).