259 P.3d 244 (2011)
Certification from the United States District Court for the Eastern District of Washington in Matthew CUDNEY, Plaintiff,
v.
ALSCO, INC., a Nevada corporation, Defendant.
No. 83124-6.
Supreme Court of Washington, En Banc.
Argued January 12, 2010.
Decided September 1, 2011.
*245 Keller W. Allen, Law Firm of Keller W. Allen PC, Spokane, WA, for Plaintiff.
Bryce James Wilcox, Attorney at Law, Spokane, WA, for Respondent.
James P. Mills, Office of the Attorney General, Tacoma, WA, amicus counsel for Department of Labor and Industries.
Jeffrey Lowell Needle, Jesse Andrew Wing, MacDonald Hoague & Bayless, Seattle, WA, amicus counsel for Washington Employment Lawyers Association.
George M. Ahrend, Ahrend Law Firm PLLC, Moses Lake, WA, Bryan Patrick Harnetiaux, Attorney at Law, Spokane, WA, amicus counsel for Washington State Association for Justice Foundation.
OWENS, J.
¶ 1 This case allows us to consider whether the Washington Industrial Safety and Health Act of 1973 (WISHA), chapter 49.17 RCW, and Washington's laws prohibiting driving while under the influence (DUI) are inadequate to promote the public policies underlying them. Matthew Cudney, whose employment was terminated by ALSCO Inc., asserted a claim in federal court for wrongful discharge in violation of public policy. Cudney alleges that he was terminated in retaliation for reporting that a managerial employee drove a company vehicle during business hours while that employee was intoxicated. The United States District Court for the Eastern District of Washington certified to us the following questions:
QUESTION NO. 1: Does the Washington Industrial Safety and Health Act (WISHA), in particular RCW 49.17.160, and accompanying Washington Administrative Code (WAC) regulations (WAC 296-360-005 et seq. and WAC 296-800-100 et seq.), adequately promote the public policy of insuring workplace safety and protecting workers who report safety violations so as to preclude a separate claim by a terminated employee for wrongful discharge in violation of public policy?
QUESTION NO. 2: Do the DUI laws of the State of Washington, in particular RCW 9.91.020, RCW 46.61.504, and RCW 4[6].61.502, adequately promote the public policy of protecting the public from drunken drivers so as to preclude a separate claim by a terminated employee for wrongful discharge in violation of public policy?
Certification to Wash. State Supreme Court at 3-4 (Certified R. Doc. 30). In response, we hold that both WISHA and our state's DUI laws adequately promote the stated public policies.

FACTS
¶ 2 In April 2004, ALSCO hired Cudney as the service manager of its Spokane branch. During his tenure at ALSCO, Cudney made numerous complaints to his supervisor about the alcohol use of John Bartich, the Spokane branch's general manager. On June 10, 2008, Cudney observed that Bartich appeared to be intoxicated at work. He noted that Bartich was weaving back and forth, had slurred speech and glazed eyes, and smelled of alcohol. Cudney then observed Bartich drive away in a company vehicle. Cudney reported his observations to the assistant general manager and to the human resources manager. On August 5, 2008, Cudney was terminated from his job.
¶ 3 Cudney brought an action in the Spokane County Superior Court for wrongful discharge in violation of public policy, claiming that he was terminated in retaliation for *246 reporting Bartich's drinking and driving. Cudney asserts that WISHA and Washington's DUI laws are two sources of public policy that prohibit the termination of his employment.
¶ 4 ALSCO removed the case to federal district court and filed a motion for partial summary judgment. The United States District Court for the Eastern District of Washington found that this court has not clearly determined whether these two sets of laws constitute inadequate means of promoting Washington's public policies. Accordingly, it certified the questions above, asking whether WISHA and the DUI laws adequately promote their respective public policies. For purposes of this certification, Cudney and ALSCO agree that WISHA and its accompanying regulations establish a clear public policy of ensuring worker safety and protecting workers who report safety violations from retaliation. Cudney and ALSCO also agree that Washington's DUI laws embody a clear public policy of protecting the public from drunk drivers.

STANDARD OF REVIEW
¶ 5 "RAP 16.16 allows this court to determine questions of law certified by a federal court if the question is one of state law that has `not been clearly determined and does not involve a question determined by reference to the United States Constitution.'" United States v. Hoffman, 154 Wash.2d 730, 736, 116 P.3d 999 (2005) (quoting RAP 16.16(a)). The question of whether adequate alternative means for promoting a public policy exist presents a question of law as long as "the inquiry is limited to examining existing laws to determine whether they provide adequate alternative means of promoting the public policy." Korslund v. Dyn-Corp Tri-Cities Servs., Inc., 156 Wash.2d 168, 182, 125 P.3d 119 (2005).

ANALYSIS
¶ 6 Absent a definite contract, employment relationships are generally terminable at will. Sedlacek v. Hillis, 145 Wash.2d 379, 385, 36 P.3d 1014 (2001). This court has recognized, however, "that the tort of wrongful discharge in violation of public policy is a narrow exception to the employment at-will doctrine." Id.
¶ 7 To prevail on a wrongful discharge claim, a plaintiff must satisfy a four-factor test. Gardner v. Loomis Armored Inc., 128 Wash.2d 931, 941, 913 P.2d 377 (1996) (citing HENRY H. PERRITT, JR., WORKPLACE TORTS: RIGHTS AND LIABILITIES § 3.1 (1991)). Specifically, the plaintiff must show: (1) "the existence of a clear public policy (the clarity element)"; (2) "that discouraging the conduct in which [he] engaged would jeopardize the public policy (the jeopardy element)"; (3) "that the public-policy-linked conduct caused the dismissal (the causation element)"; and, finally, (4) that "[t]he defendant [has not] offer[ed] an overriding justification for the dismissal (the absence of justification element)." Id. These elements are conjunctive, meaning that all four elements must be proved. Ellis v. City of Seattle, 142 Wash.2d 450, 459, 13 P.3d 1065 (2000).
¶ 8 From this court's first recognition of the tort of wrongful discharge in Thompson v. St. Regis Paper Co., we emphasized that "`courts should proceed cautiously.'" 102 Wash.2d 219, 232, 685 P.2d 1081 (1984) (quoting Parnar v. Americana Hotels, Inc., 65 Haw. 370, 380, 652 P.2d 625 (1982)). In Thompson, the court was specifically referencing the importance of exercising caution in identifying public policy. Our admonishment to "proceed cautiously" applies with as much force to the jeopardy element as it does to the clarity element because when Thompson was decided this court treated the two elements together. See Gardner, 128 Wash.2d at 941, 913 P.2d 377. We have since confirmed that "[t]his court has always been mindful that the wrongful discharge tort is narrow and should be `applied cautiously.'" Danny v. Laidlaw Transit Servs., Inc., 165 Wash.2d 200, 208, 193 P.3d 128 (2008) (quoting Sedlacek, 145 Wash.2d at 390, 36 P.3d 1014).
¶ 9 The only element we must decide now is the "jeopardy" element;[1] that is, *247 whether current laws and regulations provide an adequate means of promoting the public policies of ensuring workplace safety, protecting against retaliation for reporting safety violations, and protecting the public from the dangers of drinking and driving. In order to establish the jeopardy element, a plaintiff must show that other means of promoting the public policy are inadequate, Hubbard v. Spokane County, 146 Wash.2d 699, 713, 50 P.3d 602 (2002), and that the actions the plaintiff took were the "only available adequate means" to promote the public policy. Danny, 165 Wash.2d at 222, 193 P.3d 128. Since Gardner, this court has repeatedly applied this strict adequacy standard, holding that a tort of wrongful discharge in violation of public policy should be precluded unless the public policy is inadequately promoted through other means and thereby maintaining only a narrow exception to the underlying doctrine of at-will employment. See Gardner, 128 Wash.2d at 945, 913 P.2d 377; Hubbard, 146 Wash.2d at 713, 50 P.3d 602; Korslund, 156 Wash.2d at 181-82, 125 P.3d 119; Danny, 165 Wash.2d at 222, 193 P.3d 128.
¶ 10 In effect Cudney argues for the expansion of the "wrongful discharge against public policy" tort when he asks to proceed despite the existence of hardy statutory remedies that protect the relevant public policies. We decline to do this because we find that, applying the adequacy analysis of the jeopardy element, Cudney cannot show that WISHA or the DUI laws are inadequate to protect public policy.

I. WISHA
¶ 11 The protections provided by WISHA are adequate to promote the public policies of ensuring workplace safety and protecting workers who report safety violations. The purpose of WISHA is to make workplace conditions as safe and healthful as possible. RCW 49.17.010. WISHA requires every person who has employees to (1) "furnish each of his or her employees employment and a place of employment free from recognized hazards that are causing or [are] likely to cause death or serious physical harm," and (2) "comply with industrial safety and health standards promulgated under WISHA." WAC 296-360-010(1). In support of these objectives, WISHA also provides a remedy for employees who believe they have been discharged for reporting workplace safety concerns. RCW 49.17.160.
¶ 12 WISHA's retaliation statute provides extensive protections to employees who claim that they suffered retaliation for filing complaints related to workplace safety. See id. First, the statute provides that an employee may not be discharged for filing a complaint, testifying in any proceeding, or exercising any right discussed in WISHA. RCW 49.17.160(1). Next, the statute sets out a procedure by which any employee who believes that he or she has been terminated in violation of WISHA can file a complaint within 30 days to the director of the Department of Labor and Industries (L & I). RCW 49.17.160(2). The statute then requires the director to investigate any appropriate claim, and, if the investigation supports the employee's claim, the director is required to bring suit against the person who violated the statute. Id. If the director does not believe that a violation has occurred, the employee is allowed to bring a suit himself or herself within 30 days of the director's determination. Id. The statute requires superior courts to order all appropriate relief for cause shown. Id. Finally, the available relief is not limited to rehiring or reinstatement with back pay; these are merely examples of what types of relief could be granted. Id.
¶ 13 The controlling case, governing whether statutory remedies are adequate to promote a given public policy, is Korslund, where two plaintiffs claimed they were wrongly terminated by DynCorp for reporting safety violations, fraud, and mismanagement at the Hanford Nuclear Reservation. 156 Wash.2d at 172-73, 125 P.3d 119. We found that the federal Energy Reorganization Act of 1974(ERA), 42 U.S.C. § 5851, was *248 a clear mandate of public policy that was "intended to protect the health and safety of the public and to protect against waste and fraud in nuclear industry operations." 156 Wash.2d at 181, 125 P.3d 119. We also found that "[t]he ERA provides an administrative process for adjudicating whistleblower complaints and provides for orders to the violator to `take affirmative action to abate the violation'; reinstatement of the complainant to his or her former position with the same compensation, terms, conditions of employment; back pay; compensatory damages; and attorney and expert witness fees." Id. at 182, 125 P.3d 119 (quoting 42 U.S.C. § 5851(b)(2)(B)). We therefore concluded that the ERA provided comprehensive remedies that served to protect public policy and that the plaintiffs' claims for wrongful discharge in violation of public policy failed as a matter of law. Id. at 182-83, 125 P.3d 119. The ERA serves as a guidepost by which we can measure WISHA to see if it is adequate to protect the public policy of workplace safety and protection of workers who report safety violations.
¶ 14 Both WISHA and the ERA allow an administrative agency to perform investigations and determine whether a valid claim has been filed. RCW 49.17.160(2); 42 U.S.C. § 5851(b)(2)(A), (B), (b)(3)(A). Both WISHA and the ERA allow plaintiffs to bring claims of their own if the administrative agency does not take action. RCW 49.17.160(2); 42 U.S.C. § 5851(b)(4). Finally, under the ERA, if the secretary determines that a violation has occurred, "the Secretary shall order the person who committed such violation to (i) take affirmative action to abate the violation, and (ii) reinstate the complainant to his former position together with the compensation (including back pay), terms, conditions, and privileges of his employment, and the Secretary may order such person to provide compensatory damages to the complainant." 42 U.S.C. § 5851(b)(2)(B). Under WISHA, in contrast, the superior court has the power to order all appropriate relief, including rehiring or reinstatement of the employee with back pay. RCW 49.17.160(2). While it is true that WISHA does not spell out the possible relief in as much detail as the ERA does, the ERA also limits relief to certain specific categories, while WISHA simply orders the superior court to grant all relief that is appropriate, whatever that may be. In that sense, WISHA is actually more comprehensive than the ERA and is more than adequate.
¶ 15 Cudney particularly argues that the 30-day deadline in WISHA for filing a complaint with the director renders the WISHA remedy inadequate to protect public policy. Cf. Hubbard, 146 Wash.2d at 717, 50 P.3d 602.[2] In Hubbard, we held that an administrative procedure was inadequate to promote the public policies of uniform planning and general safety and welfare where aggrieved citizens had to receive notice of a zoning decision and make an appeal to a board of adjustment within 20 days. Id. We stated that this would mean it was "up to chance whether the public policy was enforced." Id. Hubbard is easily distinguished from the case at hand. Unlike in zoning actions, where aggrieved citizens very well might not receive notice within 20 days, employees will almost always receive immediate notice of their own termination. And in a case of retaliation under WISHA, an employee will know that he or she recently raised a safety concern. Then, the employee claiming wrongful termination need only file a complaint with L & I within 30 days, at which point L & I itself shall conduct an appropriate investigation. RCW 49.17.160(2). This gives the employee significant additional time over 30 days to prepare a case in the event *249 that L & I declines to pursue the matter.[3] Importantly, the 30-day deadline is not a strict time bar. "There may be circumstances. . . that justify tolling the thirty-day period on recognized equitable principles or because strongly extenuating circumstances exist, e.g., where the employer has concealed, or misled the employee regarding the grounds for, discharge or other adverse action." WAC 296-360-030(4). The 30-day deadline therefore does not make the statutory remedy inadequate. Cudney has asserted no reason why he was unable to file a claim within 30 days. He could have filed his complaint the very moment he was terminated or requested tolling of the 30-day time period if there was reason for his delay.
¶ 16 Our decisions in Wilmot v. Kaiser Aluminum & Chemical Corp., 118 Wash.2d 46, 821 P.2d 18 (1991), and Ellis do not alter our analysis. It is true that in Wilmot we held that a statute (RCW 51.48.025) similar to RCW 49.17.160 was not the mandatory and exclusive remedy for an employee who was allegedly terminated for filing a workers' compensation claim. Id. at 51, 65, 821 P.2d 18. While we did briefly mention the comprehensiveness and adequacy of the statute, id. at 61, 821 P.2d 18, we focused primarily on whether the statute was mandatory and exclusive. Our decision in Wilmot preceded our enumeration of the four-part Gardner test by five years. Since then, we have consistently said that a plaintiff must show that other means of promoting the public policy are inadequate. See Gardner, 128 Wash.2d at 945, 913 P.2d 377; see also Hubbard, 146 Wash.2d at 713, 50 P.3d 602; Korslund, 156 Wash.2d at 181-82, 125 P.3d 119; Danny, 165 Wash.2d at 222, 193 P.3d 128.
¶ 17 We pointed out in Korslund that Wilmot and Korslund addressed two entirely separate issues. In Wilmot, the issue was whether the legislature intended RCW 51.48.025 to be mandatory and exclusive, thus precluding a tort cause of action for violation of public policy. Korslund, 156 Wash.2d at 183, 125 P.3d 119. The key question in Korslund was, in contrast, "whether other means of protecting the public policy [were] adequate so that recognition of a tort claim in these circumstances [was] unnecessary to protect the public policy." Id. In fact, Korslund specifically found that statutory remedies were adequate to protect the public policy, even though the United States Supreme Court has found that the same statute was not mandatory and exclusive. Id. at 182-83, 125 P.3d 119. Our analysis here should follow our reasoning in Korslund. Even if a similar statute is not mandatory and exclusive, as in Wilmot, WISHA is still adequate to protect public policy. Wilmot is simply not on point.
¶ 18 In Ellis, we addressed whether it was appropriate for a trial court to issue summary judgment against a plaintiff who was allegedly terminated for refusing to follow improper procedure and filing a WISHA claim. 142 Wash.2d at 457-58, 13 P.3d 1065. The question presented by that case was whether a plaintiff had to prove that the employer's conduct would actually violate public policy or whether the plaintiff merely had to have a reasonable belief that the employer's actions violated the law. Id. at 460, 13 P.3d 1065. We held that "the jeopardy prong of the Gardner test may be established if an employee has an objectively reasonable belief the law may be violated in the absence of his or her action." Id. at 461, 13 P.3d 1065. In Ellis, we simply did not address whether WISHA adequately promoted public policy, as we necessarily only decided the questions presented by the parties. The issue of WISHA's adequacy is now squarely before us, and we disapprove of any implication in either Wilmot or Ellis that public *250 policy is not adequately promoted by WISHA.
¶ 19 In light of Korslund and our other post-Gardner cases outlining the adequacy standard of the jeopardy element, we do not find that the robust statutory remedies available in WISHA are inadequate to protect the underlying public policies of worker safety and protection of workers from retaliation for raising safety concerns. Accordingly, we answer the first certified question affirmatively: WISHA and its accompanying regulations adequately protect the identified public policies.

II. DUI Laws
¶ 20 Washington has a series of laws criminalizing driving while under the influence of alcohol. RCW 46.61.502, .504. RCW 46.61.5055 sets out the penalties for these criminal offenses, which include a mandatory jail sentence, a $5,000 fine, suspension or revocation of one's driver's license, and the installation of an ignition interlock device. Social penalties can also adhere, such as the loss of status in the community and possible suspension or termination at work. While drinking and driving remains a social problem, it does not necessarily follow that the laws in place are an inadequate means to address the problem.
¶ 21 For Cudney to succeed in this claim, he must prove that telling his manager about Bartich's drunk driving is the "only available adequate means" to promote the public policy of protecting the public from drunk driving.[4]Danny, 165 Wash.2d at 222, 193 P.3d 128. For this to be true, the criminal laws, enforcement mechanism, and penalties all have to be inadequate to protect the public from drunk driving. Cudney admits that he did not call 911 and inform the police of Bartich's drunk driving. Police and state troopers patrol our roads and highways looking for signs of driving under the influence. There is a huge legal and police machinery around our state designed to address this very problem. It is very hard to believe that the "only available adequate means" to protect the public from drunk driving was for Cudney to tell his manager about Bartich's drunk driving. Id.
¶ 22 Cudney's reporting drinking and driving to his employer is a roundabout remedy that is highly unlikely to protect the public from the immediate problem of a drunk driver on its roads. This is different from Hubbard, where we noted that it is important to protect employees against retaliation when they speak up before violations of public policy occur so that the violations can be prevented altogether. See 146 Wash.2d at 717, 50 P.3d 602. Hubbard was an employee of the Spokane County Planning Department, and he reported concerns about zoning violations to his direct supervisor, a decision maker on zoning issues. Id. at 703, 50 P.3d 602. By speaking up, Hubbard could actually stop the alleged public policy violation. That is not the case here with a DUI report to an employment supervisor with no law enforcement capability. Under a strict adequacy analysis, Cudney simply cannot show that having law enforcement do its job and enforce DUI laws is an inadequate means of promoting the public policy. See Korslund, 156 Wash.2d at 181-82, 125 P.3d 119.
¶ 23 Finally, we must remember that it is the public policy that must be promoted, not Cudney's individual interests. "The other means of promoting the public policy need not be available to a particular individual so long as the other means are adequate to safeguard the public policy." Hubbard, 146 Wash.2d at 717, 50 P.3d 602. Cudney has not shown that the current DUI laws are an *251 inadequate means of promoting the public policy, so his claim fails.

CONCLUSION
¶ 24 This court has long used the adequacy standard, finding, under the jeopardy element of our four-part Gardner analysis, that a tort of wrongful discharge in violation of public policy can proceed only when other remedies are inadequate. Accordingly, we answer the federal court's certified questions by holding that Washington's public policies of (1) promoting workplace safety and protecting workers who report safety violations and (2) protecting the public from drunk drivers are adequately promoted by WISHA and Washington's DUI laws, respectively.
WE CONCUR: BARBARA A. MADSEN, Chief Justice, GERRY L. ALEXANDER, MARY E. FAIRHURST, and JAMES M. JOHNSON, Justices.
STEPHENS, J. (dissenting).
¶ 25 The majority would close the door on a common law cause of action for wrongful discharge in violation of public policy whenever the statute that announces a clear mandate of public policy also provides some means to protect that public policy. This result departs from long-standing precedent in Washington. Moreover, it transforms the jeopardy prong of the public policy tort analysis from its proper role as a tool to evaluate the close relationship between a tort claim and the furtherance of public policy into an automatic rule of exclusion. I respectfully dissent.

ANALYSIS
¶ 26 This court first recognized a cause of action under the common law for wrongful discharge in violation of a clear mandate of public policy in the landmark case of Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 685 P.2d 1081 (1984). In cases following Thompson we acknowledged public policy tort claims generally arise in four areas: "(1) where the discharge was a result of refusing to commit an illegal act, (2) where the discharge resulted due to the employee performing a public duty or obligation, (3) where the [discharge] resulted because the employee exercised a legal right or privilege, and (4) where the discharge was premised on employee `whistleblowing' activity." Dicomes v. State, 113 Wash.2d 612, 618, 782 P.2d 1002 (1989) (citations omitted).
¶ 27 In Gardner v. Loomis Armored, Inc., 128 Wash.2d 931, 941, 913 P.2d 377 (1996), the court adopted the analytical framework set forth in a leading treatise to assess when an employee may recover for wrongful discharge in violation of public policy. See Henry H. Perritt Jr., Workplace Torts: Rights and Liabilities § 3.1 (1991). This test examines (1) the existence of a "clear public policy" ("clarity" element), (2) whether "discouraging the conduct in which [the employee] engaged would jeopardize the public policy" ("jeopardy" element), (3) whether the "public-policy-linked conduct caused the [discharge]" ("causation" element), and (4) whether the employer is "able to offer an overriding justification for the [discharge]" ("absence of justification" element). Gardner, 128 Wash.2d at 941, 913 P.2d 377. Here, only the jeopardy element is at issue.
¶ 28 Before we adopted Perritt's four-part test, our decisions tended to "lump[] the clarity and jeopardy elements together . . . ." Id.; see also Dicomes, 113 Wash.2d at 617, 782 P.2d 1002 ("[T]he employee has the burden to show that the discharge contravened a clear mandate of public policy."). By parsing out these two related but conceptually distinct concepts, this court in Gardner sought to achieve "a more consistent analysis." Gardner, 128 Wash.2d at 941, 913 P.2d 377. And in doing so, we made clear that "our adoption of this test does not change the existing common law in this state." Id.
¶ 29 Describing the jeopardy element, we explained it serves to "guarantee[] an employer's personnel management decisions will not be challenged unless a public policy is genuinely threatened." Id. at 941-42, 913 P.2d 377 (emphasis added). Also, we articulated the requisite showing a plaintiff must make in order to establish jeopardy:
To establish jeopardy, plaintiffs must show they engaged in particular conduct, and the conduct directly relates to the public *252 policy, or was necessary for the effective enforcement of the public policy. This burden requires a plaintiff to "argue that other means for promoting the policy . . . are inadequate." Perritt[, supra] § 3.14, at 77. Additionally, the plaintiff must show how the threat of dismissal will discourage others from engaging in the desirable conduct.
Id. at 945, 913 P.2d 377 (first alteration in original) (internal citation omitted).
¶ 30 This language is a paraphrase of Perritt's treatise (1991), which clearly states the jeopardy analysis in the disjunctive, i.e., the conduct furthers public policy either because the policy directly promotes the conduct or because the conduct is necessary to effective enforcement of the policy. PERRITT, supra § 3.14, at 75-76. The certified questions in this case present a direct relationship claim under the public policy of the Washington Industrial Safety and Health Act of 1973 (WISHA), chapter 49.17 RCW, and a necessity-type claim under the public policy of the laws on driving while under the influence of alcohol (DUI).

WISHA
¶ 31 The Washington legislature enacted WISHA in 1973. It was designed to complement the federal Occupational Safety and Health Act of 1970 (OSHA), and shares with OSHA the purpose of promoting workplace safety. 29 U.S.C. §§ 667(c), 651(b); RCW 49.17.010. WISHA requires every employer to (1) "furnish each of his or her employees employment and a place of employment free from recognized hazards that are causing or [are] likely to cause death or serious physical harm" and (2) "comply with industrial safety and health standards promulgated under WISHA." WAC 296-360-010(1). WISHA also contains an antidiscrimination provision which, inter alia, provides:
No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or herself or others of any right afforded by this chapter.
RCW 49.17.160(1).
¶ 32 This statute sets forth procedures by which an employee who believes that he or she has been discharged in violation of WISHA may file a complaint. RCW 49.17.160(2). The complaint must be filed with the director of the Washington State Department of Labor and Industries (L & I) within 30 days. Id. Upon receipt of the complaint, the director must cause an investigation to be conducted. Id. If the director determines that the investigation supports the employee's claim, the director is required to bring suit against the employer who violated the statute. Id. If the director does not believe that a violation has occurred, the employee must bring suit on his or her own behalf within 30 days. Id. The director must notify the employee of the decision within 90 days of the initial filing of the complaint. RCW 49.17.160(3).
¶ 33 Cudney alleges his employment was terminated for reporting workplace safety concerns under WISHA and that allowing an employee to be fired in such instances directly discourages the very conduct that WISHA promotes. I would hold that this claim satisfies the jeopardy prong of the wrongful termination analysis.
¶ 34 Washington has long recognized claims for wrongful discharge in violation of public policy premised on state workplace protection laws, including WISHA. See Wilmot v. Kaiser Aluminum & Chem. Corp., 118 Wash.2d 46, 821 P.2d 18 (1991) (recognizing claim for retaliation for filing workers' compensation claim and disapproving contrary WISHA case); Ellis v. City of Seattle, 142 Wash.2d 450, 13 P.3d 1065 (2000) (recognizing claim for retaliation for making WISHA complaint); Wilson v. City of Monroe, 88 Wash.App. 113, 943 P.2d 1134 (1997) (same; holding RCW 49.17.160 does not provide adequate, exclusive remedy); Roberts v. Dudley, 140 Wash.2d 58, 993 P.2d 901 (2000) (recognizing claim under RCW 49.12.200 and Washington's Law Against Discrimination (WLAD), chapter 49.60 RCW); Bennett v. Hardy, 113 Wash.2d 912, 784 P.2d 1258 *253 (1990) (recognizing claim under WLAD). The majority does not overrule these cases, which build on Thompson's recognition that the public policy tort claim is an important, though narrow, exception to the terminable at will doctrine. See Thompson, 102 Wash.2d at 231-33, 685 P.2d 1081. Washington adopted this exception "because it properly balances the interest of both employer and employee," as well as advances public policy. Id. at 232, 685 P.2d 1081.
¶ 35 Notably, in some cases involving public policy tort claims, the question was whether a plaintiff who had no statutory cause of action could nonetheless bring a wrongful discharge claim premised on the public policy of the statute. See Roberts, 140 Wash.2d at 77, 993 P.2d 901; Bennett, 113 Wash.2d at 929, 784 P.2d 1258; cf. Ellis, 142 Wash.2d at 461, 13 P.3d 1065 (noting, "Ellis is not required to prove an actual WISHA violation. All he has to do is prove the City terminated him for making a WISHA complaint." (citing Wilson, 88 Wash.App. 113, 943 P.2d 1134)). The starting premise of these cases is that there can be no doubt about the existence of a public policy tort claim when the plaintiff is in fact protected by the statutory remedies. It would turn this premise on its head to suggest that the existence of statutory remedies instead precludes a public policy tort claim.
¶ 36 Wilmot is particularly instructive. That case involved a discrimination provision of the Industrial Insurance Act, chapter 51 RCW, virtually identical to the WISHA provision implicated in this case. Wilmot, 118 Wash.2d at 55, 821 P.2d 18. In describing the issue before the court, we said:
In enacting RCW 51.48.025, the Legislature expressly set out the clear mandate of public policy giving rise to the exception to the employment at will doctrine. We must decide whether that public policy supports an independent tort action even though the statute sets out a remedy for violation of the statute. We have referred to this type of question twice before, that is, "whether a cause of action exists for wrongful discharge in violation of public policy when the declaration of public policy is declared in a statute already providing a remedy."
Id. at 54, 821 P.2d 18 (quoting Grimwood v. Univ. of Puget Sound, Inc., 110 Wash.2d 355, 367, 753 P.2d 517 (1988) and citing Bennett, 113 Wash.2d at 925, 784 P.2d 1258). Given this language, I fail to understand how the majority can accept ALSCO's position, based solely on language in Korslund v. DynCorp Tri-Cities Services, Inc., 156 Wash.2d 168, 183, 125 P.3d 119 (2005), that this case and Wilmot involve two entirely separate issues. ALSCO's Resp. Br. at 31-32.[1]
¶ 37 Wilmot in fact considered the adequacy of the relevant statutory remedies in its analysis, noting, "it is not simply the presence or absence of a remedy which is significant; rather, the comprehensiveness, or adequacy, of the remedy provided is a factor which courts and commentators have considered in deciding whether a statute provides the exclusive remedies for retaliatory discharge in violation of public policy." 118 Wash.2d at 61, 821 P.2d 18. Moreover, the court in Wilmot recognized that its holding implicated WISHA because it expressly disapproved of Jones v. Industrial Electric-Seattle, Inc., 53 Wash.App. 536, 768 P.2d 520 (1989) (holding that statutory remedy under WISHA, RCW 49.17.160, precludes wrongful discharge public policy claim). See Wilmot, 118 Wash.2d at 66, 821 P.2d 18.
¶ 38 The majority seems to suggest that Wilmot is outdated given our subsequent refinement of the public policy tort analysis into the four-part Perritt test in Gardner. ALSCO's Resp. Br. at 30 n. 3; Majority at 248-49. But this characterization of Wilmot fails to account for Ellis, which confirmed the same reasoning several years after Gardner. The plaintiff in Ellis alleged that he was terminated in retaliation for filing a WISHA complaint against his employer. He "sued *254 the City alleging two causes of action, wrongful termination based on public policy, relying on Gardner, and retaliatory discharge in violation of RCW 49.17.160(1) stemming from his L & I complaint." Ellis, 142 Wash.2d at 457, 13 P.3d 1065 (citation omitted). We held that both claims could go forward. In the course of our analysis we expressly addressed the jeopardy prong and held that the Court of Appeals erred by concluding as a matter of law that Ellis's conduct was not necessary to enforce the public policy at issue. Id. at 462-64, 13 P.3d 1065. Our analysis echoed the view of Professor Perritt that "public policy tort cases involving employee reports of employer misconduct to outside agencies present relatively strong arguments on the jeopardy element, because of the likelihood that agencies charged with public policy enforcement depend on such reports." PERRITT, supra § 3.34, at 117. Thus, had we intended to reject a public policy tort claim premised on WISHA because we viewed the test from Thompson somewhat differently in the intervening years between Wilmot and Gardner, Ellis gave us that opportunity. Instead of rejecting this claim under the jeopardy prong, we solidified its existence. This court in Ellis cited with approval the leading Court of Appeals case recognizing RCW 49.17.160 as the basis for a public policy tort claim notwithstanding the availability of remedies under the statute. 142 Wash.2d at 461, 13 P.3d 1065 (citing Wilson, 88 Wash.App. 113, 943 P.2d 1134). Notably, the agency charged with implementing WISHA does not believe that it precludes a public policy tort claim. L & I filed an amicus brief in this case in support of Cudney. This brief cautions that, because we have consistently recognized a tort claim based on the WISHA antidiscrimination statute, we should not revisit that issue absent a change in statute. Br. of Amicus Curiae Dep't of L & I (Amicus Br.) at 5-8.[2]
¶ 39 Even assuming it remains an open question whether the administrative remedies under WISHA preclude a public policy tort claim, I would conclude that WISHA remedies are inadequate to promote the public policy at issue. L & I explains that when it brings a discrimination action under RCW 49.17.160, it does so to carry out its statutory purpose and dutyto investigate complaints of discrimination against employees who voice safety and health concerns in the workplace and to seek limited relief on their behalf. WAC 296-360-020. L & I controls the litigation and brings the action to seek remedies that benefit the complainant, but L & I does not represent the complainant. Further, L & I can seek only those limited remedies the statute authorizes it to pursue, such as back pay and reinstatement. See WAC 296-360-020; -160. It does not plead compensatory damages, including emotional distress damages, or front pay. See Amicus Br. at 10-12. In contrast, the Energy Reorganization Act at issue in Korslund provided an administrative process for actually adjudicating whistleblower complaints, providing tort-like remedies, including reinstatement, back pay, and compensatory damages, as well as attorney fees and expert witness fees. 42 U.S.C. § 5851(b)(2)(B); see Amicus Br. at 19. Given this distinction, reliance on Korslund is misplaced.
¶ 40 Perhaps the most striking feature of the WISHA administrative scheme that renders the statutory remedy inadequate is the 30-day limitation period. The majority asserts that 30 days is ample time for an employee to bring a claim, but fails to consider what we have said about the "adequacy" of shortened filing periods in other contexts involving employee claims. In the context of employer-employee arbitration contracts, we held that claim filing periods of up to 180 days are substantively unconscionable. See Adler v. Fred Lind Manor, 153 Wash.2d 331, 356-57, 103 P.3d 773 (2004) (citing federal cases recognizing that a 30-day filing period was unconscionably short and holding that the 180-day filing deadline at issue was unconscionable). We observed in Adler that employees who are constructively terminated through adverse employment action or hostile work environments may lose the opportunity *255 to recover under a shortened filing period. If instead of firing an employee directly, a company merely offers progressively fewer or worse-quality assignments, a 30-day deadline will quickly lapse before the "last straw" that encourages the employee to file a complaint.
¶ 41 Furthermore, even an unequivocally fired employee may not learn the reason for his or her termination straight away if the reason is retaliation for making workplace-safety complaints. Cf. Hubbard v. Spokane County, 146 Wash.2d 699, 703-06, 50 P.3d 602 (2002) (describing how an employee fired for insisting that his superiors follow the law was ostensibly terminated for a nondiscriminatory reason, as part of a "`reorganization'"). WISHA allows for an extension of time if the employer "concealed, or misled the employee regarding the grounds for, discharge," WAC 296-360-030(4), but it does not relax the filing deadline if the employer gives no reason at all. The employees who will be affected by our ruling are often at-will employees who may be fired at any time for any reason or no reason. Ford v. Trendwest Resorts, Inc., 146 Wash.2d 146, 152, 43 P.3d 1223 (2002). Therefore, the employer is within its rights to terminate the employee without explanation, leaving the employee to investigate and discover the wrong on his or her own.
¶ 42 Of course, none of this even addresses how unrealistic it is to expect that within 30 days of getting a pink slip an employee will be able to find and hire a lawyer, investigate the real reason for his or her termination, and file suit. Employees in this situation are likely thinking more about finding a new job and paying their bills within the first month of being fired.
¶ 43 The inadequacy of the WISHA remedy, including the extremely short period for bringing a claim, is strong evidence that the legislature recognized the existence of a private cause of action and meant RCW 49.17.160 to provide a supplemental investigative process. The statute has remained unchanged since its enactment in 1973, and we have consistently interpreted it to be coextensive with common law remedies. See RCW 49.17.160. We should be very cautious of changing our view under a newfound "jeopardy" analysis at this late juncture.
¶ 44 Instead, we should reaffirm that the jeopardy prong of our public policy tort analysis is but one aspect of a four-part test designed to identify a common law cause of action where this is necessary to encourage employees to act in a way that furthers public policy. In this regard, the public policy tort claim is aptly described as resting on a private attorney general concept. The jeopardy prong must be understood in this context. It does not require that a tort claim be the only possible way to enforce the public policy. Rather, consideration of the "adequacy" of means other than the tort claim to enforce the public policy involves the same type of inquiry that this court undertook in Wilmot and Ellis. These cases provide the most direct answer to the first certified question before the court. The answer is no.

DUI Laws
¶ 45 Cudney and ALSCO agree the DUI laws do not require or expressly encourage the reporting of criminal violations. Even so, Cudney contends that reporting violations is necessary for the effective enforcement of the public policy. Accordingly, the second certified question asks whether the DUI laws adequately promote the public policy so as to preclude a wrongful discharge claim. Both parties agree we can examine the adequacy of the DUI laws and determine this issue as a matter of law. Certification at 2.
¶ 46 The Washington legislature has adopted a number of statutes criminalizing driving under the influence of alcohol and imposing penalties for violations. See RCW 9.91.020; RCW 46.61.502, .504, .5055. ALSCO concludes that the existence of these statutes precludes a wrongful discharge claim as a matter of law because "Cudney cannot show that reporting a drunk driver to his employer is the `only available adequate means' to prevent drunk driving." ALSCO's Resp. Br. at 37 (quoting Danny v. Laidlaw Transit Servs. Inc., 165 Wash.2d 200, 222, 193 P.3d 128 (2008)).
¶ 47 This argument misapprehends the focus of the jeopardy analysis in determining *256 whether a public policy tort claim will lie. Echoing ALSCO's argument, the majority reads our precedent as suggesting that jeopardy cannot be shown if any other avenue exists to address the public policy at issue. Majority at 249-50. If this were the case then we would never allow a tort claim to vindicate a public policy expressed in a criminal statute. Yet, this court has not held that the existence of a criminal or regulatory enforcement mechanism necessarily precludes a Thompson tort claim. Rather, in the context of whistleblower-type claims we have examined the adequacy of the enforcement mechanism at issue with a view toward determining whether public policy would be jeopardized if an employee could be fired for reporting violations. See, e.g., Ellis, 142 Wash.2d at 461-62, 13 P.3d 1065; Hubbard, 146 Wash.2d at 717, 50 P.3d 602; see generally Gardner, 128 Wash.2d at 941, 913 P.2d 377 ("plaintiffs must prove that discouraging the conduct in which they engaged would jeopardize the public policy").
¶ 48 Relevant to this analysis is consideration of whether, by relying solely on criminal regulatory or administrative enforcement schemes, "it would often be left up to chance whether the public policy was enforced." Hubbard, 146 Wash.2d at 717, 50 P.3d 602. In Hubbard, for example, the court noted that, even though the zoning decision questioned by the plaintiff could have been challenged administratively, several factors made it uncertain whether the administrative process would be pursued in every case. Id. Encouraging employees to speak up against zoning decisions without fear of termination "would be more efficient . . . to prevent these types of violations before they occurred." Id.
¶ 49 Similarly here, it is uncertain whether a violation of the DUI laws will be pursued in a criminal prosecution. For this to occur law enforcement must first locate the drunk driver and probable cause must exist to make an arrest. Following an arrest, the prosecutor then has discretion whether to charge a crime. Assuming that charges are filed, a judge or jury must find evidence beyond a reasonable doubt to convict. And it is unfortunately a consequence of limited public resources that many instances of drunk driving go undetected until public safety has been jeopardized. Relying solely upon the criminal law mechanism for enforcement of the DUI laws thus leaves the enforcement of the public policy uncertain. Cf. id. It would be more efficient to encourage employee actions that reinforce the DUI laws and prevent life-threatening violations before they occur.[3] Accordingly, I would answer the second certified question no.

CONCLUSION
¶ 50 Both WISHA and Washington's DUI laws provide avenues to promote the important public policies they reflect. The statutory remedies, however, do not as a matter of law foreclose the possibility of a common law tort claim by a wrongfully terminated employee. Considering the jeopardy prong of our four-part public policy tort analysis, we should answer no to the certified questions. Accordingly, I dissent.
WE CONCUR: CHARLES W. JOHNSON and TOM CHAMBERS, Justices, and RICHARD B. SANDERS, Justice Pro Tem.
NOTES
[1] The parties do not dispute the clarity element of the analysis; they agree that WISHA and its accompanying regulations establish a clear public policy of ensuring worker safety and protecting workers who report safety violations and that the DUI laws establish a clear public policy of protecting the public from drunk drivers. The "causation" element and "absence of justification" element are fact-specific inquiries that we are not asked to decide here.
[2] The dissent also cites Adler v. Fred Lind Manor, 153 Wash.2d 331, 103 P.3d 773 (2004), regarding the 30-day filing deadline. Dissent at 254-55. Adler, however, does not stand for the proposition that any specific time limitation, especially one considered and imposed by the legislature, is inadequate. Rather, Adler held that the specific terms of a privately negotiated arbitration agreement that cut short the statute of limitations for filing a claim were unconscionable because they foreclosed the opportunity for state or federal agency investigation and mediation and did not provide for tolling. 153 Wash.2d at 355, 357, 103 P.3d 773. These egregious facts do not characterize the terms of WISHA, which involves L & I and allows for extension of the time to file a complaint.
[3] The dissent also takes issue with the fact that L & I, not the complainant, controls the litigation if it pursues the complaint. Dissent at 254-55. This, however, misses the point of the jeopardy prong of the analysis, which is to consider whether the statutory protections are adequate to protect the public policy, not whether the claimant could recover more through a tort claim. If L & I pursues a claim, it enforces the public policies underlying WISHA. While we find it irrelevant as long as the public policies are adequately protected, nothing in WISHA prohibits L & I from pleading tort-like remedies. WAC 296-360-020 ("The suit may ask the court to . . . grant other appropriate relief."); see RCW 49.17.160(2). The role of L & I does not render WISHA inadequate.
[4] It is notable that Cudney reported the drunk driving to his employer, not to the police. As we have previously noted, "the jeopardy element . . . generally involves a question of fact," as well as a question of law. Korslund, 156 Wash.2d at 182, 125 P.3d 119 (citing Hubbard, 146 Wash.2d at 715, 50 P.3d 602). For now we decide the issue as a matter of law. However, we might have a different case if Cudney acted pursuant to or in service of enforcement of the state's DUI laws and faced termination for that. There, Cudney might be able to argue that his action "`was necessary for the effective enforcement of the public policy.'" Id. at 181, 125 P.3d 119 (internal quotation marks omitted) (quoting Hubbard, 146 Wash.2d at 713, 50 P.3d 602). The statutory system in place is adequate to promote the public policy. Cudney's problem here is that he acted outside of it.
[1] The issue in Korslund was whether to expand the tort of wrongful termination in violation of public policy where no such tort had previously been recognized under the Energy Reorganization Act of 1974, 42 U.S.C. § 5851. In that context, the court applied the four-part test from Gardner to the particular facts before it. Significantly, the court did not suggest it was retreating from established precedent recognizing a public policy tort claim premised on state workplace protection statutes.
[2] As L & I observes: "Complainants and [L & I] have relied on Wilmot for more th[a]n 18 years to conduct their affairs." Amicus Br. at 7 n. 4.
[3] The majority suggests that, as a question of fact, Cudney might have a better case had he reported the drunk driving to law enforcement rather than to his employer. Majority at 250 n. 4. It is unclear how this conclusion follows from the majority's analysis because under that analysis Cudney's actions would never be the only available adequate means to enforce drunk driving laws.