# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

ERICKA M. RICKMAN )
                                  )     DIVISION ONE
          Appellant, )
                                    )     No. 70766-3-I
         v. )
                                    )
PREMERA BLUE CROSS, )     UNPUBLISHED OPINION
                                    )
         Respondent. )     FILED: September 2, 2014
_____ )

DWYER, J. — Ericka Rickman was terminated from her position as director of Ucentris Insured Solutions—a subsidiary of Premera Blue Cross—in the wake of two events, both of which occurred around six weeks prior to her termination. One event was triggered by an anonymous e-mail complaint, wherein an independent contractor for Ucentris reported a conflict of interest involving Rickman and her son, who also worked as an independent contractor for Ucentris. The other event occurred when Rickman expressed concern to her supervisor that a Premera business proposal could violate HIPAA.[1] Following an internal investigation of Rickman in response to the anonymous complaint, Rickman was terminated from her position. She then filed suit against Premera, alleging that she had been unlawfully discharged in violation of public policy.

---

[1] Health Insurance Portability and Accountability Act of 1996. Pub. L. No. 104-191, 110 Stat. 1936.

No. 70766-3-I/2

She now appeals from an adverse grant of summary judgment, contending that the trial court erred in concluding that she failed to satisfy her burden as to the "jeopardy" and "absence of justification" elements of her cause of action. Because the trial court correctly ruled as to the "jeopardy" element, we affirm without considering its treatment of the "absence of justification" element.

I

Rickman served as director of Ucentris from August 2004 until November 2009, when her employment was terminated. Ucentris—a subsidiary of Premera—sells health, life, and risk management products to individuals and small businesses. As an organization, Premera is focused on identifying and preventing any actual, potential, or perceived conflicts of interest involving its employees. It has in place a number of policies and guidelines relating to conflicts of interest that it expects all of its employees—including those of its subsidiaries—to follow. These include a code of conduct, a conflict of interest questionnaire policy, and a conflict of interest and disclosure questionnaire. Pertinent language contained within these policies and guidelines is reproduced below:

- Conflict of interest may occur if your outside activities or personal interests influence *or appear to influence* your job performance or the decisions you make in the course of your job responsibilities.
- It is each individual's responsibility to not only avoid obvious conflicts, but to also avoid *the appearance of a conflict of interest.* . . . To manage potential conflicts Premera relies on you to fully disclose any relationships that may have the potential of being misinterpreted by others.
- "Conflict of Interest" refers to a situation in which activities,

interactions, or offers of grants or other monetary compensation from outside entities influence, or may appear to influence, an associate's job performance or the decisions that he/she makes in the course of his/her job responsibilities.

- A conflict of interest may take many forms, but usually arises when an associate might be able to use his or her position: to influence Premera business decisions in ways that give an improper advantage to themselves, a family member, or another person; or to obtain for themselves, a family member, or other person a financial benefit unrelated to the compensation they receive for the work they perform at Premera.

(Emphasis added.)

When employees are hired, and annually thereafter, they complete the conflict of interest disclosure questionnaire, which poses questions relating to potential conflicts, including the following:

- During the past 12 months, have you or has any family member received any fee, commission, gift, or other compensation due to the sale of a health care service agreement or insurance policy by or on behalf of [Premera or any of its subsidiaries]?
- During the past 12 months, have you or has any family member received any fee, commission, gift, or other compensation arising from [a] . . . purchase . . . [or] sale . . . made by or for . . . [Premera or any of its subsidiaries]?

Ucentris hires independent contractors to sell its insurance products. Some of these agents are called "captive agents," meaning that they can sell insurance products offered only by Premera and its subsidiaries. Rickman's son, Taylor Vidor, worked as a "captive agent." Rickman stated that she told her first supervisor at Ucentris—Steve Melton, now deceased—about Vidor and was told that she did not need to disclose the potential conflict of interest because Vidor was not an employee. Rickman also stated that she disclosed her relationship with Vidor to Jessica Johnson, an employee in the human resources department

at Premera. Rickman had no specific discussions with anyone in Premera's compliance and ethics department about her relationship with Vidor. Her final supervisor, Rick Grover, was unaware that her son was a Ucentris "captive agent."

In 2008, Vidor was promoted from a "captive agent" to a "subject matter expert" (SME). Although subordinates of Rickman recommended that Vidor be promoted, Rickman approved their recommendation. When Vidor's co-SME stepped down, Rickman approved an increase in Vidor's "override"—his commission—from five to ten percent, which was twice the percentage "override" of other SMEs. Vidor did, however, take over the workload of his former co-SME.

On September 11, 2009, Premera's compliance department received an anonymous e-mail complaint from an individual who later identified himself as Steven Lopez—a Ucentris "captive agent" at the time. Lopez reported his concern that a conflict of interest existed given that Rickman's son worked with Ucentris. Among other complaints, Lopez reported that Rickman had placed Vidor in an elevated position as a SME; that Vidor reported on the daily activities of other "captive agents" directly to Rickman; that Vidor sat in on productivity reviews of "captive agents"; that Vidor had input on which "captive agents" received leads and which did not; and that the general feeling in the office was that being friends with Vidor would curry favor with Rickman. Lopez requested that the matter be investigated and initially requested anonymity, claiming that he feared retaliation by Rickman.

Following Lopez's anonymous complaint, Premera launched an investigation, which was conducted by Nancy Ferrara. When Rickman was interviewed by Ferrara, Rickman denied that her relationship with Vidor created a conflict of interest and stated that their relationship was known throughout Ucentris. She indicated that her first supervisor, Melton, had known about the relationship and she stated that she had told a former Premera human resources representative named Jessica Johnson about her relationship with Vidor, but that Johnson "never got back to her and eventually left Premera." According to Ferrara, "Human resources did not have any record that Ms. Rickman had contacted Ms. Johnson."

Lopez and another "captive agent," Mark Stryzewski, reported that Rickman had told them that she was concerned about Premera finding out about her relationship with Vidor and had instructed them not to tell anyone outside of Ucentris about their relationship. Although Rickman claimed that she did not have any oversight role with the "captive agents," Stryzewski stated that it was his perception that Rickman did, in fact, have the ultimate authority to make important decisions regarding "captive agents." Other "captive agents" shared the same or similar perceptions of Rickman's authority.

In late October 2009, Ferrara shared the results of her investigation with Grover, including her recommendation that Rickman be dismissed. Among other things, Ferrara concluded that Rickman

> exhibited poor judgment and a lack of integrity by, among other things, not reporting her relationship with Mr. Vidor to Compliance or Human Resources at any point during her employment

- 5 -

(especially when she approved of his SME designation and the doubling of his override); making decisions that allowed at least a perception of favoritism toward her son; seemingly condoning familial relationships within Ucentris without Compliance's involvement, which created an environment of at least perceived favoritism; failing to be forthcoming with me during the investigation; speculating about who the complainant was; and authorizing the termination of Ms. Lopez's captive agent contract under the circumstances.[2]

Grover agreed with Ferrara's recommendation and terminated Rickman's employment on November 3, 2009.

Prior to the termination, and around the time that Lopez lodged his anonymous complaint, Rickman had expressed concern to Grover that a potential change in Premera's business practice could violate health insurance privacy laws. Rickman learned that Pacific Benefits Trust, a large association underwritten by Premera, was likely merging with Washington Grocers Trust, which was underwritten by a different company. Rickman confirmed this information with the director of Premera's "Small Business Group," Robin Hilleary. When Rickman told Hilleary that a Ucentris "captive agent" had a client who, in light of the merger, wanted the agent to look for other non-Premera insurance for his business, Hilleary told Rickman that Premera did not want agents to look outside Premera for insurance for their clients. Hilleary also told Rickman that Premera planned to use Ucentris agents to transfer the membership of preferred groups of the merged associations into associations that were underwritten by Premera. Rickman believed that this approach would

---

[2] Following Lopez's anonymous complaint, Rickman approved the recommendation to terminate Ucentris's contract with Lopez's wife who was also a "captive agent."

constitute an illegal form of "risk bucketing"—that is, separating riskier policy holders from less risky ones and putting them into separate "buckets" for underwriting—because doing so would require disclosure of private policyholder information.

Although Rickman admittedly did not know the details of the plan and although she was unable to say that it was, in fact, illegal, Rickman nevertheless relayed her concerns to Grover, telling him that the plan "had HIPAA written all over it." She then urged him to "take it up the chain of command to make sure everything was legal." However, Grover demurred, stating, "Ericka, we don't always tell everything to [Senior Executive Vice President of Sales and Marketing] Heyward Donnigan because she's like a dog on a bone when she finds something out." Rickman responded, "But that's the way I have always done my business," to which Grover replied, "Well, there's a new Sheriff in town."

Subsequently, Grover forwarded a string of e-mail messages to Rickman. In Rickman's opinion, these e-mail messages confirmed her concern that Premera leadership planned on engaging in a form of "risk bucketing" that could potentially violate health insurance privacy laws. Rickman reiterated her concern to Grover that the plan was inappropriate and possibly illegal.

Ferrara had no knowledge of Rickman's alleged concern or complaint to Grover until after Rickman's dismissal when Rickman filed a complaint with the Equal Employment Opportunity Commission. Additionally, Grover stated that the type of "risk bucketing" that caused Rickman concern would not have involved

disclosing information protected by HIPAA or UHCIA.[3] Nonetheless, Grover ultimately did not adopt the proposed plan based upon his concerns about the plan's favoritism toward Ucentris over Premera's other distribution channels.

On December 15, 2010, Rickman filed suit in Snohomish County Superior Court, alleging that Primera had wrongfully discharged her in violation of public policy. On April 11, 2013, Primera moved for summary judgment. Thereafter, in a letter opinion, the trial court granted Premera's motion, ruling that Rickman did not establish a prima facie case of wrongful discharge in violation of public policy—a decision which was based on her failure to produce evidence as to the "jeopardy" and "absence of justification" elements of her claim.

Rickman appeals.

II

Rickman contends that the trial court erred by granting summary judgment for Premera. This is so, she asserts, because genuine issues of material fact exist as to the "jeopardy" and the "absence of justification" elements. We disagree.

"A motion for summary judgment presents a question of law reviewed de novo." Nat'l Sur. Corp. v. Immunex Corp., 162 Wn. App. 762, 770, 256 P.3d 439 (2011), aff'd, 176 Wn.2d 872, 297 P.3d 688 (2013). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

---

[3] Washington's Uniform Health Care Information Act, ch. 70.02 RCW.

judgment as a matter of law." CR 56(c). The nonmoving party on summary judgment "must set forth specific facts showing that there is a genuine issue of material fact." Dicomes v. State, 113 Wn.2d 612, 631, 782 P.2d 1002 (1989). "Summary judgment is appropriate if in view of all of the evidence, reasonable persons could reach only one conclusion." Yankee v. APV N. Am., Inc., 164 Wn. App. 1, 8, 262 P.3d 515 (2011).

In her complaint, Rickman claimed that she was wrongfully discharged in violation of public policy. Thus, in order to survive Premera's summary judgment motion, Rickman was required to produce evidence that, if proved, would establish the following four elements: (1) the existence of a clear public policy ("clarity" element);[4] (2) that existing means of promoting the public policy were inadequate such that discouraging Rickman's conduct would jeopardize the public policy ("jeopardy" element); (3) that her public policy-linked conduct caused her dismissal ("causation" element);[5] and (4) that Premera's justification for her dismissal was prextexual ("absence of justification" element). See, e.g., Korslund v. DynCorp Tri-Cities Servs., Inc., 156 Wn.2d 168, 178, 181-82, 125 P.3d 119 (2005). "These elements are conjunctive, meaning that all four elements must be proved." Cudney v. ALSCO, Inc., 172 Wn.2d 524, 529, 259 P.3d 244 (2011). Our Supreme Court has indicated that "the wrongful discharge

---

[4] The trial court ruled that a clear public policy existed in favor of maintaining and protecting patient privacy interests. Neither party challenges this ruling on appeal.

[5] Although the trial court did not address the "causation" element in its ruling, on appeal Premera avers that we may also affirm the trial court's grant of summary judgment based on Rickman's failure to produce evidence necessary to create genuine issues of material fact as to the "causation" element. Because we affirm the trial court's ruling based on the "jeopardy" element, we need not address Premera's averment.

tort is narrow and should be 'applied cautiously.'" Danny v. Laidlaw Transit

Servs., Inc., 165 Wn.2d 200, 208, 193 P.3d 128 (2008) (quoting Sedlacek v.

Hillis, 145 Wn.2d 379, 390, 36 P.3d 1014 (2001)); accord Weiss v. Lonnquist,

173 Wn. App. 344, 352, 293 P.3d 1264, review denied, 178 Wn.2d 1025 (2013).

Rickman makes two arguments in support of her contention that the trial

court erred with respect to the "jeopardy" element. First, that it erred by

concluding that no issues of material fact existed as to whether discouraging her

conduct would jeopardize the public policy in favor of maintaining and protecting

patient privacy interests. Second, that it erred by concluding that adequate

alternative means of promoting this policy existed. Neither argument is

persuasive.

"The jeopardy element sets up a relatively high bar." Weiss, 173 Wn. App.

at 352. Not only is the plaintiff required to "show that she engaged in particular

conduct and the conduct directly relates to the public policy or was necessary for

the effective enforcement of the public policy," she "must prove that discouraging

the conduct that she engaged in would jeopardize the public policy." Weiss, 173

Wn. App. at 352. "'This burden requires a plaintiff to argue that other means for

promoting the policy . . . are inadequate.'" Piel v. City of Federal Way, 177

Wn.2d 604, 611, 306 P.3d 879 (2013) (alteration in original) (internal quotation

marks omitted) (quoting Gardner v. Loomis Armored, Inc., 128 Wn.2d 931, 945,

913 P.2d 377 (1996)). "If there are other adequate means available, the public

policy is not in jeopardy and a private cause of action need not be recognized."

Weiss, 173 Wn. App. at 352; see also Cudney, 172 Wn.2d at 530 (explaining that

application of a "strict adequacy standard" produces "only a narrow exception to the underlying doctrine of at-will employment"). Although inquiry as to the "jeopardy" element is generally factual in nature, "the question whether adequate alternative means for promoting the public policy exist may present a question of law." Korslund, 156 Wn.2d at 182.

Rickman argues first that the trial court erred by concluding that no issues of material fact existed as to whether discouraging her conduct would jeopardize the public policy in favor of maintaining and protecting patient privacy interests. This is so, she asserts, because it improperly relied on the Supreme Court's decision in Dicomes to reach its conclusion. However, Rickman's efforts to distinguish Dicomes are unavailing.

The particular language from Dicomes that the trial court relied upon and with which Rickman takes issue is as follows:

> In determining whether retaliatory discharge for employee whistleblowing activity states a tort claim for wrongful discharge under the public policy exception, courts generally examine the degree of alleged employer wrongdoing, together with the reasonableness of the manner in which the employee reported, or attempted to remedy, the alleged misconduct.

113 Wn.2d at 619.

The whistleblowing activity in Dicomes occurred after a violation of the law; however, nothing in that decision limits its application to instances in which whistleblowing postdates a violation. Moreover, Rickman offers no persuasive reason for cabining the application of Dicomes to its facts. Indeed, where an employee reports concern with potential employer activity—as Rickman did

here—a trial court may examine the record to approximate the degree of wrongdoing, if any, that would have taken place in the event that the employer had engaged in the activity. Similarly, a trial court may examine the reasonableness of the manner in which the employee reported the potential misconduct or attempted to remedy it. It was proper for the trial court to apply the standard in Dicomes to the facts in this case.[6]

Turning to the trial court's application of Dicomes, there was no error. The trial court was persuaded by the fact that Premera did not implement the "risk bucketing" plan and by Rickman's failure to apprise herself of the details of the plan in order to determine whether it was, in fact, illegal. After examining the trial court record and the parties' briefs, we cannot conclude that the manner in which Rickman reported her concerns was reasonable, or that Premera—had it actually implemented the "risk bucketing" plan—would have engaged in any degree of wrongdoing. Rickman's ignorance of the plan's details and legality, coupled with her failure to make meaningful inquiries, gainsays her position that she reported her concerns in a reasonable manner. Moreover, she adduced no evidence that the abandoned "risk bucketing" plan would have been illegal, relying only on her statement to Grover that the plan "had HIPAA written all over it." Guesswork and intuition do not meet the high bar set by the "jeopardy" element. No genuine

---

[6] Contrary to Rickman's intimation, our Supreme Court's decision in Cudney, wherein it analyzes Hubbard v. Spokane County, 146 Wn.2d 699, 50 P.3d 602 (2002), does not categorically bar a grant of summary judgment against a plaintiff who raises concerns before a violation of the law occurs. Although Cudney and Hubbard empower courts to protect a plaintiff who raises concerns before wrongful activity occurs, they do not immunize that plaintiff from an adverse grant of summary judgment. Instead, courts must apply the standard in Dicomes to determine whether summary judgment should be granted.

issues of material fact exist as to whether discouraging Rickman's conduct would jeopardize the public policy of maintaining and protecting patient privacy interests.

Rickman next argues that the trial court erred by concluding that adequate alternative means of promoting the public policy existed. This is so, she asserts, because (1) no Washington authority holds that an internal reporting system can constitute an adequate means of promoting a public policy; (2) her method of reporting was more effective than Premera's internal reporting system; and (3) the complaint mechanisms within HIPAA and UHCIA are only available for actual rather than potential noncompliance. We disagree.

The "strict adequacy" standard requires available adequate alternative means of promoting the public policy; however, contrary to Rickman's first assertion, there is no indication that available alternative means must carry the force of law in order to be adequate. Nevertheless, Rickman argues that a private internal reporting system cannot be adequate, reasoning that if it were otherwise, then "an employer could simply escape liability by creating a complaint mechanism, regardless of whether it subsequently terminated an employee for taking action that promoted the public policy by preventing a law violation." Rickman reasons that were we to determine that Premera's internal reporting system constituted an adequate alternative means of promoting the public policy, she would be left without a private remedy against Premera, despite the fact that she was responsible for preventing a law violation. It follows from this, she urges, that an alternative means is only adequate if it exposes the

employer to liability. However, even assuming—without deciding—that Rickman did, in fact, prevent a law violation, "[t]he Supreme Court has repeatedly emphasized that *it does not matter* whether or not the alternative means of enforcing the public policy grants a particular aggrieved employee any private remedy." Weiss, 173 Wn. App. at 359. The effect of the Supreme Court's unswerving approach is that the question of whether an alternative means is adequate is answered not by reference to the terminated employee's potential recourse against the employer, but by determining whether the alternative means promotes the public policy at issue. Focusing on whether the public policy is promoted ensures that the wrongful discharge in violation of public policy cause of action exists as "only a narrow exception to the underlying doctrine of at-will employment." Cudney, 172 Wn.2d at 530. Were we to embrace Rickman's reasoning, we would impermissibly broaden the narrow exception drawn by the Supreme Court.

Nevertheless, Rickman asserts that direct reporting was a superior method to utilizing Premera's internal reporting system. Not only is her assertion speculative, it fails to address the applicable standard, which is concerned not with winnowing down the available alternatives until only the best one remains but, rather, with establishing a baseline above which any available alternative is considered adequate. Rickman had to present evidence tending to show that anonymous electronic or telephonic reporting was an inadequate alternative means of promoting the public policy at issue. Yet, she failed to offer any evidence impugning the evidence in the record of Premera's robust internal

reporting system. Given the existence of Premera's internal reporting system, which—as evidenced, in part, by the prompt investigation following Lopez's complaint against Rickman—appears, on this record, to be functioning effectively, we conclude that the system provided an available adequate alternative means by which Rickman could have reported her concerns, thereby promoting the public policy in favor of maintaining and protecting patient privacy interests. Therefore, without deciding whether HIPAA or UHCIA provided available adequate alternative means, we conclude that the trial court did not err in its ruling with respect to the "jeopardy" element.

We affirm the superior court's grant of summary judgment in favor of Premera.

We concur: